Fathy M.A. SALEH, and Godwin O. Mbagwu, Plaintiffs,

v.

Eddie N. MOORE, Jr., et al., Defendants.

No. CIV.A.3:97CV460.

United States District Court, E.D. Virginia, Richmond Division.

May 12, 2000.

---

James S. Crocket, Jr., Samuel M. Brock, III, Richard F. Hawkins, III, Rani R. Shea, Mays & Valentine, Richmond, VA, for Plaintiffs.

Alison P. Landry, Claude A. Allen, Neil A. McPhie, Office of Attorney General, Archibald Wallace, III, L. Lee Byrd, Jerry Gilgore, William A. Forrest, Jr., Sands,

Anderson, Marks & Miller, Richmond, VA, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

On May 21, 1999, judgment was entered on a jury verdict for damages returned on March 24, 1999, in favor of the Plaintiffs, Fathy M.A. Saleh and Godwin O. Mbagwu, against Eddie N. Moore, Jr., the President of Virginia State University ("VSU") since 1993; Martha E. Dawson, Provost and Vice–President for Academic Affairs at VSU; Lorenza W. Lyons, Dean of the School of Agriculture, Science, and Technology at VSU; Florence Farley, Professor and Chair of the Department of Psychology at VSU; and Thomas H. Epps, Chair of the Department of Chemistry at VSU.[1] Also, on May 21, 1999, the Court entered an order of injunctive relief based on the jury's findings.

Pursuant to 42 U.S.C. § 1988, Saleh and Mbagwu have filed a Motion for an Award of Attorneys' Fees and Costs. They also have moved for monetary sanctions pursuant to Fed.R.Civ.P. 37. For the reasons set forth below, the motion for attorney's fees and costs is granted, in part. The motion for an award of sanctions under Rule 37 is denied.

## FINDINGS OF FACT

On June 13, 1997, Saleh, who is of Egyptian origin (and a Caucasian) filed a complaint against the Defendants (and others who were dismissed as the results of various pretrial rulings) asserting federal claims of racial and national origin discrimination and retaliation for the exercise of free speech. Saleh also presented several state law claims that were based essentially on the same factual assertions on which he predicated the federal claims of discrimination and retaliation. Later, three additional Plaintiffs, Mbagwu, who is of Nigerian origin (and black), Shaukat Siddiqi, who is of Pakistan origin (and caucasian), and Janeshwar Upadhyay, who is of Indian origin (and caucasian), filed actions raising very similar claims against most of the same Defendants, and the actions were consolidated with Saleh's action for discovery and trial.[2] Siddiqi and Upadhyay settled their disputes with the Defendants on the eve of trial. Saleh and Mbagwu presented their claims that had survived summary judgment to the jury.

The law firm of Mays & Valentine ("M & V"), which has represented Saleh from the initiation of his action, served as lead counsel once all four actions were consolidated. Mbagwu was represented by M & V and Macaulay Lee & Powell ("ML & P").[3]

Assessment of the claims for attorneys' fees must be made in perspective of the claims asserted, the factual predicate on which the claims were based, and the monetary and equitable relief obtained at trial. Hence, it is necessary to recite in some detail the factual and legal bases for the asserted claims and to assess how they fared throughout the course of the litigation.

### 1. The Legal Basis Of Claims Made By Saleh And Mbagwu

In his Amended Complaint, Saleh sought damages and injunctive relief from

---

1. Moore, Dawson, Lyons, and Farley will be referred sometimes to as the "Saleh Defendants." Saleh's case against a sixth defendant, Gerald Demers, went to trial but the jury returned a verdict in his favor. Moore, Dawson, Lyons, and Epps will be referred to sometimes as the "Mbagwu Defendants."

2. Siddiqi and Upadhyay filed their complaints on May 18, 1998 and by Order dated July 29, 1998 their actions were consolidated for discovery and trial with Saleh's action. Mbagwu filed his complaint on September 10, 1998 and by Order dated October 19, 1998 his action was consolidated for discovery and trial with the already consolidated action of Saleh, Siddiqi and Upadhyay.

3. After ML & P ascertained a conflict of interest between its clients, Siddiqi and Upadhyay, Siddiqi was represented by the law firm of Durrette, Irvin & Bradshaw, and attorney's from Thompson & McMullan served as counsel for Upadhyay.

Moore, Lyons, Dawson, Farley, and Edward Mazur,[4] stating the following claims:

Count I: race discrimination, against all Defendants, in violation of 42 U.S.C. § 1981;

Count II: race and national origin discrimination, against all Defendants, in violation of 42 U.S.C. § 1983;

Count III: conspiracy to interfere with civil rights, against all Defendants, in violation of 42 U.S.C. § 1985;

Count IV: retaliation for protected speech, against all Defendants, in violation of 42 U.S.C. § 1983;

Count V: defamation, against Defendants Demers and Mazur;

Count VI: conspiracy to injure in reputation, trade, business or profession, against all Defendants, in violation of Va.Code §§ 18.2–499 and –500;

Count VII: tortious interference with the so-called Resources Group of Virginia, Inc. contract, against Defendants Moore and Lyons;

Count VIII: tortious interference with the so-called WREMCON contract, against Defendants Moore, Lyons, Dawson, and Mazur; and

Count IX: tortious interference with his VSU employment contract, against all Defendants.

Counts I, III, VI, VIII and IX were dismissed on summary judgment, and Count V was voluntarily dismissed by Saleh. As a result, only Count II (for race and national origin discrimination)[5] and Count IV (retaliation for the exercise of protected speech) reached the jury.

Mbagwu's complaint asserted the following claims against Defendants Moore, Dawson, Lyons, and Epps:

Count I: race and national origin discrimination in violation of 42 U.S.C. § 1983;

Count II: race discrimination, in violation of 42 U.S.C. § 1981;

Count III: conspiracy to interfere with civil rights, in violation of 42 U.S.C. § 1985; and

Count IV: conspiracy to injure in reputation, trade, business or profession, in violation of Va.Code §§ 18.2–499 & 500.

Three of Mbagwu's four claims (Counts II, III and IV) were dismissed on summary judgment. The only claim that was presented to the jury was that aspect of Count I asserting national origin discrimination under § 1983.[6]

**2. The Factual Basis For The Claims Of Saleh And Mbagwu**

From the outset of the litigation, Saleh and Mbagwu contended that they had been victims of discrimination based on their national origin. In Saleh's case, the discrimination allegedly took the form of low performance evaluations and low salary increases as well as interference with, or foreclosing entirely, his efforts to obtain grants and his ability to perform current contracts or to pursue business expectancies, the effect of which was to diminish Saleh's income. The national origin discrimination against Mbagwu manifested itself in the form of low performance evaluations, low salary increases and the interference with, and foreclosing of, Mbagwu's efforts to obtain grants.

Saleh also asserted that the Defendants retaliated against him for making complaints about racial and national origin discrimination to VSU's Board of Visitors. Those complaints were presented in a document, dated July 6, 1995, entitled "Recent Acts of Racial Discrimination Against White & Foreign–National Faculty and Administrative Staff at Virginia State University" (the "Recent Acts Paper"). The Recent Acts Paper was distributed to

4. All claims against Mazur were dismissed on summary judgment.

5. Saleh's pattern and practice and disparate impact claims regarding the extra-pay and summer pay policies failed on summary judgment.

6. The race aspect of Mbagwu's § 1983 claim in Count I failed on summary judgment.

members of VSU's Board shortly thereafter, and the retaliation is said to have begun following its receipt. Saleh contended, in Count IV, that this retaliation offended his right to free speech under the First Amendment.

The national origin discrimination against both men was alleged to have been the result of a deliberate effort, spawned by Moore and implemented by the other Defendants, to rid VSU of what Moore considered to be an excessive number of foreign-born faculty members. The Plaintiffs' theory was that the VSU administration sought to achieve that discriminatory end by economic means, principally by giving them and other foreign-born faculty small salary increases and poor merit evaluations, and by foreclosing the supplemental income that comes from grants, outside contracts and summer school teaching assignments. The evidentiary foundation for the national origin discrimination claims thus lay in statements of discriminatory animus toward foreigners and the way in which the Defendants manipulated VSU's system for determining compensation and for awarding, securing or sponsoring grants for faculty members and, in Saleh's case, VSU's handling of certain outside contracts as to which Saleh was a consultant or administrator.

Both men presented race-based discrimination claims which arose out of the same basic activity which formed the factual predicate for their national origin discrimination claims. Here too, the discriminatory end was achieved by the same economic means. And, for the most part, the same facts formed the basis for both the civil rights conspiracy claims and the state law claims of conspiracy to injure another in his profession or reputation, which were asserted by both Saleh and Mbagwu. Saleh's claims for defamation and for tortious interference with various contracts also were said to have been based on much of the same conduct which gave rise to the national origin and race discrimination claims.

Although Saleh's Count IV, a claim for redress of retaliation for having complained to VSU's Board of Visitors about past racial and national origin discrimination, was based on a document dated July 6, 1995 which was presented to the Board a day or so later, many of the allegedly discriminatory incidents recited in that document were incidents or conduct that also were reflected in Saleh's race and national discrimination claims. And, for reasons not entirely clear, the Defendants, during pretrial discovery and at summary judgment, approached the defense of the retaliation charge in large measure by asserting that the discriminatory conduct referred to in the Recent Acts Paper were not true.[7] And, as with the discrimination claims, the retaliatory end was said to be achieved by economic means. For those three reasons, the facts surrounding the complaints made in the Recent Acts Paper became entwined with Saleh's claim of retaliation for having exercised the right of protected speech in which he engaged in complaining to the Board of Visitors about racial and national origin discrimination at VSU.

### 3. The Course of Pretrial Proceedings: Discovery And Continuances

Pre-trial discovery by both sides was extensive. For example, the parties took a total of 32 depositions and the paper discovery involved approximately 100,000 documents. The Plaintiffs introduced 611 exhibits at trial, the Defendants introduced 104. The final pretrial conference lasted almost two full days.

Unfortunately, the Defendants' recalcitrance in discovery necessitated four mo-

---

7. That approach to the defense of the retaliation claim at trial was largely foreclosed by rulings made by the Court at the final pretrial conference. However, by that time, the De-

fendants had conducted much discovery in furtherance of their inexplicable "truth" defense.

tions to compel[8] and two motions for sanctions relating to discovery violations.[9] The Court granted three of the Motions to Compel and twice imposed sanctions in an effort to force the Defendants to fulfill discovery obligations. The substantial judicial involvement in discovery disputes in this action was extremely rare for litigation conducted in this district. And, even when sanctions were not imposed, the principal fault for the discovery disputes lay generally in the Defendants' obdurate insistence that they could unilaterally limit discovery because they thought the Plaintiffs' claims to have been ill-founded.

Also, the Defendants inappropriately invoked the option to produce business records under Fed.R.Civ.P. 33(d) by failing to make an adequate specification as required by the rule, by using it to avoid answering hard questions, and by dumping large volumes of unindexed documents on the Plaintiffs. The Plaintiffs incurred substantial attorneys' fees and expenses in a good faith effort to search the proffered records, in compelling the Defendants to provide proper answers to the interrogatories once counsel concluded the answers would not be discerned by examining the tendered records, and in seeking and receiving sanctions which finally produced answers.

Further, it is appropriate to note that, even where Rule 33(d) was not invoked, VSU's records relating to salaries, performance evaluations, and the administration of grants and contracts were produced in an abysmal state of organization which often made it difficult for counsel for Plaintiffs to make use of those records without extensive supplementation by deposition. This too increased attorneys' fees associated with both document review and the conduct of depositions.

The action was vigorously defended in the deposition stage, in the pretrial motions phase, at the final pretrial conference, at trial, and in post-trial proceedings, including the fee application process. It is safe to say that the Defendants left no stone unturned and no defense unpursued.

The temporal duration of this action also was highly unusual for this district. A principal reason for this was the need of the Plaintiffs to develop from the documentary evidence and depositions circumstantial evidence to compliment the direct evidence that supported their discrimination and retaliation claims. Another principal reason was the strategy of the Defendants to employ a full-court press on virtually every aspect of the case. And, the action was continued four times.[10]

---

**8.** These included: (1) Plaintiff's *Motion to Compel Defendants to Answer Interrogatories and produce Documents*, March 4, 1998; (2) *Renewed Motion to Compel*, May 18, 1998; (3) *Plaintiff's (Saleh) Motion to Compel*, July 16, 1998; and (4) *Plaintiff's (Saleh) Motion to Compel EPA to Produce Witnesses for Deposition*, June 15, 1998.

**9.** These included: (1) *Motion for Sanctions for Failing to Make Disclosure and to Cooperate in Discovery*, July 16, 1998; and (2) *Plaintiff's Motion for Sanctions*, January 4, 1999.

**10.** The original trial date in Saleh's action was January 7, 1998. After the Court granted certain parts of the *Defendants' motion to dismiss*, Saleh was permitted to file an Amended Complaint as to which the Defendants again filed a motion to dismiss. That motion was denied in its entirety, but the delay caused by the lengthy motions necessitated a delay in the original trial date; and

trial was then set for June 8, 1998. However, effective midnight of June 7, 1998, the presiding judge, the Honorable Robert R. Merhige, Jr., retired from service as United States District Court Judge, and the case was reassigned necessitating a second continuance and a new trial date on September 28, 1998. Shortly thereafter, the Court discovered that three new Plaintiffs, Siddiqi, Upadhyay and Mbagwu, recently had filed virtually identical complaints against the Defendants, thereby prompting the Court to consolidate the actions for discovery and trial and then to move the trial date to November 30, 1998. However, a conflict of interest arose between Siddiqi and Upadhyay, causing their common counsel, ML & P, to be disqualified, thereby forcing the continuance of the trial to March 8, 1999, in order to allow the parties to retain new counsel.

### 4. The Results Of The Summary Judgment Motions

Upon completion of discovery, the Defendants moved for summary judgment on all claims of all four Plaintiffs.[11] Except for claims alleging national origin and race discrimination and Saleh's retaliation claim, all other claims of all four Plaintiffs were dismissed on summary judgment. *Fathy M.A. Saleh, et al. v. Virginia State University, et al.,* No. 3:97cv460 at 37–38, 40, 43–44, 49–51, 58, 65–66, 68, 72 (E.D.V.A. Feb. 25, 1999). And, many facets of the surviving race and national origin claims were foreclosed as time-barred. *Id.* at 31–32. However, the evidence respecting the time-barred components of the race and national origin discrimination claims was relevant to prove discriminatory intent as to those aspects of those claims which had survived summary judgment. Therefore, those evidentiary matters remained as part of the case to be tried, *albeit* not as independent claims, but as evidentiary support for the surviving claims for race and national origin discrimination and for retaliation.

Also, in the interest of judicial economy, to avoid duplication, and in an effort to conserve resources for the parties, the Plaintiffs were required to file a consolidated response to the Defendants' separate summary judgment motions. M & V took the lead in preparing the parts of the consolidated response that were based on the common core of facts that warranted consolidation of the actions for discovery and trial.

### 5. The Settlement Effort

Having become intimately familiar with the evidence in all four cases by virtue of the discovery disputes and the summary judgment process, the Court concluded that there was a significant likelihood that a jury would return a verdict for compensatory and punitive damages for some, if not all, of the four Plaintiffs on some of the claims that had survived summary judgment. Therefore, the parties were directed to participate in a settlement conference. Because of the obvious animosity of the Defendants toward the Plaintiffs and because the discovery process had been so very contentious, the Court presided over the conference. In an effort to facilitate settlement, the Court instructed the parties to prepare settlement position papers. M & V again took the lead in preparing for the settlement conference to the extent that the preparation involved the common factual basis for the claims. Considering the nature of the case, this was a substantial undertaking with the end product numbering about 100 pages.

The formal settlement conference lasted for the better part of one day and counsel continued the effort in the ensuing several days. Ultimately two cases, those brought by Siddiqi and Upadhyay, were settled. However, the Defendants rejected Saleh's opening settlement demand and elected to make no settlement proposal at all to Saleh, thereby foreclosing further settlement discussions. The Defendants' counter-offer to Mbagwu's demand was rejected as entirely insufficient, and rightly so.

### 6. The Trial

The trial lasted ten days, nine of which were consumed with presentation of evidence. The evidence offered at trial generally fit one of eight categories. First, there was direct evidence of national origin discrimination in that, shortly after taking the reins as President at VSU, Moore concluded that there were too many foreign

---

11. Before the motion for summary judgment, Saleh had voluntarily dismissed Count V, the defamation claim against Demers and Mazur. At oral argument, Siddiqi abandoned Count III, the § 1981 race discrimination claim against Moore, Dawson, Lyons, and Knight–Mason, which also eliminated the race facets of Counts I and II. Also at oral argument on the motion for summary judgment, Upadhyay abandoned his Count IV, a conspiracy to interfere with civil rights claim against Moore, Dawson, Lyons, Clark, and Knight–Mason, which eliminated the race aspects of Count I and II.

faculty members at VSU, articulated that conclusion to others, including an American-born faculty member and a member of VSU's Board of Visitors, and stated that he intended to do something to remedy that undesirable situation. Second, there was evidence offered to show that, after Moore's arrival at VSU, Saleh and Mbagwu, both foreigners, and other foreign faculty members, were given the lowest (Mbagwu) and next to lowest (Saleh) salary increases in their respective departments, and that American-born, black faculty members, who were less qualified or equally qualified to caucasian and foreign-born faculty members, received larger salary increases. Third, there was evidence that foreign-born faculty members were denied promotions to leadership positions in their departments in favor of American-born, black faculty members having significantly lesser qualifications. Fourth, there was evidence that Saleh and Mbagwu were treated differently than American-born, black faculty members in respect of the awarding of grants and, in Saleh's case, in permitting involvement in outside contracts or business expectations.[12] Fifth, there was direct evidence of racial prejudice against Caucasian faculty members. Sixth, there was evidence that, in July 1995, Saleh complained to VSU's Board of Visitors about racial and national origin discrimination. Seventh, there was evidence that Moore, Farley, Dawson, and Lyons retaliated against Saleh for having presented those complaints to the Board of Visitors. Finally, there was evidence of emotional and economic injury suffered by Saleh and Mbagwu.

The defense sought to explain the low evaluations and salary increases by offering explanations that they were race and national origin neutral. To that end, the defense strategy was to attack the job performance of Saleh and to meet Mbagwu's evidence with testimony of the Defendants that sought, unsuccessfully, to show that the evaluation process was not animated by discrimination. The defense sought to disprove racial and national origin bias and disparate treatment in the award of grants and contract interference by testimonial disclaimers of the Defendants. The Defendants sought to defeat Saleh's retaliation claim largely by offering testimonial disclaimers that the alleged retaliatory acts were not taken with a retaliatory animus. To meet those disclaimers, it was necessary for the Plaintiffs to be able to refute the conclusory disclaimers with specific factual refutation. That, the Plaintiffs did, extensively and by using well the discovery depositions and documents, as well as the results of the analyses which ensued the relief in two of the motions to compel discovery.

Thus, the nature and context of the Plaintiffs' claims, and of the defense strategy, implicated proofs of numerous factual events, many of which were proved or bolstered by related discriminatory events. And, the prevalent thread of connective evidence focused significantly on the Defendants' intent, which, although shown by direct evidence, was also the subject of extensive circumstantial evidence. As was true in the discovery phase of the case, the Defendants mounted a comprehensive defense at trial, the effect of which was to prompt a not insignificant rebuttal case.

For use in presenting their own cases, meeting the defense, and cross-examining, the Plaintiffs sensibly developed a system to effectively and efficiently manage documents and deposition transcripts.[13] That system was developed by using a reasonable combination of legal assistants and lawyers. At this point, it is appropriate to

---

12. As to the second, third and fourth categories, some of the evidence probative of discriminatory animus was also the evidence that supported independent discrimination claims that had been dismissed on summary judgment as time-barred.

13. That same system was necessary to manage the sizeable data accumulated in documents and the substance of depositions to be used in conducting other depositions and addressing the summary judgment motions.

note that the system, as developed and used throughout the litigation, depended heavily on legal assistants. And, as the Court noted on the record, the efficiency demonstrated at the final pretrial conference and at trial was attributable, in no small respect, to the fine work of the Plaintiffs' legal assistants. That work also served to reduce the lawyers' time (and fees) devoted to that aspect of the litigation.

### 7. The Verdict, The Damages And The Injunctive Relief

After nine days of trial evidence, the jury returned a verdict for Mbagwu against Moore, Dawson, Lyons, and Epps on his § 1983 claim of unlawful and intentional discrimination on the basis of national origin and awarded him $194,829.00 in compensatory damages, and further awarded punitive damages in the amounts of: $16,500.00 against Moore; $4,560.00 against Dawson; $8,054.00 against Lyons; and $6,600.00 against Epps, for a total of $35,714.00 in punitive damages. The total monetary award was therefore $230,543.

The jury also returned a verdict for Saleh against Moore, Dawson, Lyons, and Farley on the § 1983 retaliation claim in Count IV and awarded him compensatory damages in the sum of $97,769.00, and punitive damages in the amounts of: $12,375.00 against Moore; $1,140.00 against Dawson; $2,015 against Lyons; and $4,050.00 against Farley, for a total of $19,580.00 in punitive damages. Saleh's total recovery was $117,349. The jury found Demers not liable on Count IV. The jury returned a verdict in favor of all Defendants on Count II, Saleh's § 1983 race and national origin discrimination claims.

On May 21, 1999, the Court entered an order awarding judgment in favor of each Plaintiff on the respective jury verdict. Also, the May 21 Order granted permanent injunctive relief against Moore, Dawson, Lyons, and Epps, in their official and individual capacities, as well as their successors in their official capacities at VSU, enjoining them from discriminating against Mbagwu on the basis of his national origin. And, the May 21 Order also granted permanent injunctive relief against Moore, Dawson, Lyons, and Farley, in their official and individual capacities, as well as their successors in their official capacities at VSU, enjoining them from retaliating against Saleh for having exercised his right of free speech under the First Amendment* of the Constitution of the United States to complain about alleged acts of race and national origin discrimination by certain administrators at VSU.

The Defendants subsequently filed a Motion for Judgment as a Matter of Law, or, in the Alternative, Motion for New Trial or Remittur. As was true for discovery, pretrial and trial proceedings, the post-trial motions were extensive and the Plaintiffs incurred significant legal fees in meeting the post-trial motions. The Court denied the Motion in whole by Order dated July 22, 1999. On August 18, 1999, the Defendants filed a Notice of Appeal, and on August 31, 1999, Saleh also filed a Notice of Appeal.[14]

### DISCUSSION

Counsel for the Plaintiffs have submitted extensive documentary and affidavit support for the fees and costs incurred in litigating this lengthy case. The Defendants adamantly (and again voluminously), but without any meaningful supporting documentation and largely by presenting conclusory, pejorative affidavits and argu-

---

**14.** Although the action is on appeal, the granting of attorney's fees to the prevailing party in this action is not premature. It is appropriate for the Court to calculate the fees and costs while the matter is fresh and the recollection of the manner in which the action was litigated is vivid. Moreover, a stay of execution on the judgment on attorneys' fees and costs while the case is on appeal will be entered and, therefore, it is appropriate to consider the matter at this juncture.

ments, have opposed the fee award requested by Saleh and, to a far lesser extent, the application made by Mbagwu.

## I. Prevailing Party Requirement

■ In any action brought under 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). The Supreme Court has instructed that "a prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)(quoting S.Rep. No. 94–1011, p. 4 (1976), U.S.Code Cong. & Admin. News 1976, p. 5912)(internal quotation marks and citation omitted); *accord Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 174 (4th Cir.1994). The burden of establishing entitlement to a fee award is on the fee applicant. *See Hensley*, 461 U.S. at 437, 103 S.Ct. 1933.

■ To qualify as a "prevailing plaintiff", a party must:

[O]btain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought.... In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

*Farrar v. Hobby*, 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (citations omitted).

■ Saleh obtained an enforceable money judgment for both compensatory and punitive damages against all the Defendants from whom he seeks attorneys' fees. Saleh also was awarded injunctive relief in the form of a permanent injunction against the Defendants Moore, Dawson, Lyons, and Farley from further retaliating against Saleh. Accordingly, the judgment secured by Saleh materially altered the legal relationship between the parties by modifying the Defendants' behavior in a way that directly benefits Saleh, specifically, by requiring the Defendants to pay Saleh a monetary sum and by prohibiting the Defendants from further retaliating against him. Therefore, Saleh is a prevailing party as to Moore, Dawson, Lyons, and Farley; and, under the statute and the decision in *Farrar*, Saleh is entitled to recover reasonable attorneys' fees from Moore, Dawson, Lyons, and Farley.

Likewise, Mbagwu obtained an enforceable money judgment for compensatory and punitive damages against all the Defendants from whom he seeks attorney's fees. Mbagwu too was awarded a permanent injunction against the Defendants from further discriminating against Mbagwu on the basis of his national origin. That judgment also materially altered the legal relationship between the parties by modifying the Defendants' behavior in a way that directly benefits Mbagwu, specifically, by requiring the Defendants to pay Mbagwu a monetary sum and by prohibiting the Defendants' from further discriminating against him. Accordingly, Mbagwu also is a prevailing party and is entitled to recover reasonable attorneys' fees from all the Defendants against whom he prevailed.

## II. The General Framework

This application for fees and the Defendants' opposition to it must be considered in perspective of the basic principles applicable to the award of attorney's fees in civil rights actions generally. And, it is necessary to apply the precepts that control the award of attorney's fees where, as here, the Plaintiffs have not prevailed on all claims asserted in the Complaint.

To begin, it must be remembered that Congress enacted the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, to permit awards of reasonable attorney's fees to prevailing parties in civil rights litigation for the purpose of ensuring "'effective access to the judicial pro-

cess' for persons with civil rights grievances." *Hensley*, 461 U.S. at 429, 103 S.Ct. 1933 (*quoting* H.R.Rep. No. 94–1558, P.1 (1976)). Mindful of that purpose, the Supreme Court, in *Hensley*, held that: "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933.

Of course, from that initial fee calculation, it is necessary to exclude hours that were not "reasonably expended." *Id.* at 434, 103 S.Ct. 1933. The Court explained this requirement as the exercise of billing judgment by which "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Id.*

██ The product obtained by multiplying reasonable hours spent by a reasonable rate produces a lodestar figure which "is presumed to be the reasonable fee contemplated by § 1988." *City of Riverside v. Rivera*, 477 U.S. 561, 568, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). However, as the Supreme Court explained in *Hensley*, "[t]here remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.'" *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933; *see also Rivera*, 477 U.S. at 568, 106 S.Ct. 2686. The authority cited by the Supreme Court in *Hensley* for the upward and downward adjustments to the lodestar fee were the decisions in *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974), and *Copeland v. Marshall*, 641 F.2d 880, 890 (D.C.Cir.1980) (*en banc*). The so-called twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney

due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. However, as the Supreme Court made clear in *Hensley*, "many of these [*Johnson*] factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley*, 461 U.S. at 434 n. 9, 103 S.Ct. 1933.

██ Another principal factor used to adjust the lodestar fee is the result achieved. And, "[t]his factor is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933.

In that respect, it is necessary to address two questions:

> First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

*Hensley*, 461 U.S. at 434, 103 S.Ct. 1933.

Recognizing that not all cases are the same and that some civil rights cases will involve a single claim, while in others there will be multiple claims, the Supreme Court, in *Hensley*, explained that with respect to many multiple claim cases:

> [T]he plaintiff's *claims* for relief will *involve a common core of facts or will be based on related legal theories.* Much of counsel's *time will be devoted generally to the litigation as a whole*, making it difficult to divide the hours expended on a claim-by-claim basis. Such a *lawsuit cannot be viewed as a series of discreet claims. Instead*, the district court

should *focus on the significance of the overall relief* obtained by the plaintiff *in relation to the hours reasonably expended* on the litigation.

*Hensley,* 461 U.S. at 435, 103 S.Ct. 1933 (emphasis added).

With those precepts in mind, the Supreme Court instructed in considerable detail on the approach that is to be taken in multiple claim cases.

We hold that the *extent of a plaintiff's success is a crucial factor in determining* the *proper amount* of an award of *attorney's fees* under 42 U.S.C. § 1988. Where the plaintiff has *failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claims* should be *excluded* in considering the amount of a reasonable fee. Where a lawsuit consists of *related claims,* a plaintiff who *has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised.* But where the plaintiff achieved *only limited success,* the district court should award only that amount of fees that is reasonable in relation to the results obtained.

*Hensley,* 461 U.S. at 440, 103 S.Ct. 1933 (emphasis added).

In *Rivera,* the Court, applying the principles it had announced in *Hensley,* expounded upon the considerations to be taken into account in measuring success and results. In so doing, the Court explained that:

[t]he *amount of damages* a plaintiff recovers is certainly *relevant* to the amount of attorney's fees to be awarded under § 1988. *See Johnson,* 488 F.2d at 718. *It is, however, only one of many factors* that a court should consider in calculating an award of attorney's fees.

*Riverside,* 477 U.S. at 574, 106 S.Ct. 2686 (emphasis added).

In *Rivera,* the Court rejected the argument that fee awards were to be propor-

tionate to the amount of damages actually recovered. It is important to assess the rationale given by the Supreme Court for that conclusion.

First, the Supreme Court recognized that:

... a civil rights plaintiff *seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms.* And, Congress has determined that '*the public as a whole has an interest in the vindication of the rights* conferred by the statutes enumerated in § 1988, *over and above the value* of a civil rights remedy *to a particular plaintiff....* ' Regardless of the form of relief he actually obtains, *a successful civil rights plaintiff often secures important social benefits that* are not reflected in nominal or relatively small damages awards.

*Riverside,* 477 U.S. at 574, 106 S.Ct. 2686 (emphasis added) (citations omitted).

Second, the Court explained that "[i]n addition, the damages a plaintiff recovers contributes significantly to the deterrence of civil rights violations in the future." *Id.* at 575, 106 S.Ct. 2686. Third, the Court declared that "Congress expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit 'does so not for himself alone but also as a private attorney general, vindicating a policy that Congress considered of the highest importance.' " *Id.* (citing H.R.Rep. No. 94–1558, p. 2 (1976))(internal quotation marks and citation omitted). Finally, after noting that "[b]ecause damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief," the Court held that "[a] rule that limits attorney's fees in civil rights cases to a proportion of the damages awarded would seriously undermine Congress' purpose in enacting § 1988." *Id.* at 575–76, 106 S.Ct. 2686.

■ In sum, it is essential to assess the extent to which the results obtained vindicate important constitutional interests and thereby serve the public interest. Thus, to the extent that the defendants in a case have engaged in lawless, unconstitutional conduct and the litigation was necessary to remedy that misconduct, the relief obtained cannot be measured exclusively in monetary terms, but also must take into account the fundamental effect of all relief obtained, both monetary and equitable. And, it is important to remember that:

> There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment.

*Hensley,* 461 U.S. at 436–37, 103 S.Ct. 1933.

With the foregoing instruction from the Supreme Court in mind, it is now time to turn to the fee applications submitted by Saleh and Mbagwu.

### III.   Saleh's Application For Fees

#### A.   Reasonableness of Rates

M & V has proved that the hourly rates charged for their services are reasonable. The rates for the M & V lawyers range from $115 to $235 per hour depending on the experience of the particular lawyer. The rates for the legal assistants range from $70 to $90 per hour, again depending on experience. Nothing in the submissions made by the Defendants raises a challenge to the hourly rates. But, unlike their submission respecting Mbagwu's application, the Defendants do not specifically eschew a challenge to the hourly rates claimed by M & V in the Saleh case. That, however, makes no difference because in Mbagwu's case, "the defendants do not contest the reasonableness of the

hourly rates," (Def's Response and Opposition to Plaintiffs' Petition for Attorneys' Fees and Costs at 16), and that would include the rates charged by M & V for serving as counsel to Mbagwu. And, those rates are the same as those used by M & V in calculating the fee claim in Saleh's case. In any event, the record here establishes that the hourly rates issued to calculate Saleh's fee request are reasonable.

#### B.   Number of Hours Reasonably Expended

The fee applications submitted by M & V, as counsel for Saleh, request a total award of fees in the amount of $982,835.59.[15] This represents the time of nine lawyers for a total of 4,497 hours and 1,667.1 hours in paralegal services, for a total of 6,164.1 hours over a two year period.

To begin, it must be noted that M & V has not included in its fee application all of the time that M & V concluded, after examining its billing records, was devoted exclusively or primarily to claims as to which the Defendants were awarded summary judgment. (Crockett Aff. ¶ 5). Nor does the fee application include time devoted exclusively or primarily to claims on which Saleh did not prevail at trial. (*Id.*) The excluded time amounts to $206,727.50. Although this exclusion may not have been required because the claims to which the excluded fees related were based, in some measure, upon the common core of facts that supported the claim on which Saleh prevailed, the deducted time appears reasonably to approximate the time devoted to: (a) the effort to develop and present the legal predicates for the claims that were defeated at the summary judgment stage; and (b) the development, in discovery, of evidence that related solely to the claims defeated on summary judgment and the presentation of evidence at trial that related solely to the claims on which Saleh did not prevail at trial. Hence, to the

---

**15.** M & V originally claimed $969,235.00 but discovered a mathematical error and in- creased the claim by $13,600.59 to $982,-835.69 to account for that error.

extent that Saleh's counsel reasonably could be expected to do so, they have excised from the fee request that time which arguably could be construed as distinct in all respects from the successful retaliation claim.

It is difficult to discern the basis for the Defendants' objection to the hours for which compensation is sought, except to identify general grousing about the fact that the defeated claims were brought in the first place and that the Defendants had to respond to substantial discovery. To begin, the Defendants' opposition to the number of hours claimed by M & V is wholly inadequate because it is supported only by three vague, general affidavits which do not identify particular time entries, or even groups thereof, which are thought by the Defendants to have been improperly claimed. Those affidavits, and the Defendants' opposition to fees, are based on the opinions of the Defendants' counsel that the defeated claims were frivolous and should never have been brought and their view that the discovery conducted by the Plaintiffs was too broad. Neither of those unsupported general objections is a valid ground of objection to the amount of fees requested, given the exclusions already made by M & V.

Even the claims defeated at summary judgment were not, as the Defendants argue, frivolous. Indeed, most of the discrimination claims that were defeated at summary judgment had a strong factual basis. They were defeated on the law as barred by the statute of limitations (rejecting the continued events theory which Saleh offered to keep the evidentiarily supported, but old, claims alive). And, the civil rights conspiracy and the state law conspiracy claims were defeated by other legal barriers, such as the intracorporate conspiracy doctrine, even though there was evidence tending to show that many of the Defendants, all employees of the same corporate employer, had engaged in conspiratorial conduct.[16] Furthermore, Saleh's national origin discrimination claim certainly could have been decided the other way at trial. On that point, it is significant that the jury found national origin discrimination as to Mbagwu and that Mbagwu's and Saleh's national origin discrimination claims were grounded, in significant part, on the same evidentiary base. Thus, it is likely that the verdict in favor of the Defendants in Saleh's national origin discrimination claim turned on the question of causation, not on a failure of proof of national origin discrimination because there was strong direct and circumstantial evidence that the Defendants engaged in that sort of discrimination.

As to the complaints about discovery, the Defendants are simply wrong. The Defendants themselves complicated and expanded the discovery process enormously by narrowly reading discovery requests and by refusing to provide reasonable discovery. This, in turn, created much of the increased amount of time devoted by M & V to discovery. Much of that increased effort by M & V was caused also by the unwarranted and improper reliance on Fed.R.Civ.P. 33 by the Defendants, who did not remotely comply with the specification requirements of that rule. And, as proved to be the case, the Plaintiffs could never have ascertained the answers from the documents anyway. Indeed, a major accounting firm hired by the Defendants could ascertain the answers only after extensive consultation with numerous of VSU's employees.

Without doubt, some of the Plaintiffs' discovery was too broad and some depositions went too far afield, but, for the most part, the fault for the sizeable fees incurred during discovery lay with the Defendants. That is evidenced, in part, by the several motions to compel discovery on which the Plaintiffs prevailed, by the sanc-

---

**16.** The Plaintiffs pressed for application of certain exceptions to the intracorporate conspiracy doctrine but were unsuccessful in that effort, although there were close questions on some of their points. *See Fathy M.A. Saleh,* No. 3:97cv460 at 51–55.

tions imposed, and, equally, by the absence of protective or compulsory discovery motions by the Defendants. Thus, to the extent that discovery problems increased fees, the Defendants have no one to blame but themselves.

In any event, most of the Defendants' complaints about the hours devoted to the litigation appear to be addressed to time already excluded from the fee application.

That brings us to the only specific aspect of the Defendants' objections to the time claimed in support of the Saleh fee application: that there was no common core of facts between the discrimination claims (race and national origin) which went to trial, but which Saleh lost, and the retaliation claim on which Saleh prevailed.[17] In support of that objection, the Defendants argue that M & V should not be able to recover fees for time incurred in pursuing (1) those aspects of the discrimination claims based on pre–1995 grant projects (which were dismissed as independent claims on summary judgment as time-barred); (2) the race and national origin discrimination claims (on which Saleh did not prevail at trial); and (3) those aspects of his claims that involved evaluations or pay raises.[18]

In reply, Saleh asserts that M & V should recover for all hours claimed because the retaliation claim, on which Saleh

did prevail, embraced a core of facts common to those which were presented in the defeated discrimination claims. Therefore, M & V argues that time spent on, and evidence presented as to, the discrimination claims were necessary to prevail on the retaliation claim. Additionally, M & V asserts that, to combat the defensive position taken by the defendants on the retaliation claim, it was necessary for Saleh to show that the complaints of discrimination which led to the retaliation were validly made.

Three of the *Johnson* factors serve to assist in determining whether the number of hours submitted by M & V are reasonable as against those objections. These are: Factor 1: the time reasonably required to litigate issues reasonably presented in the action; Factor 2: the novelty and difficulty of the questions posed by the action; and Factor 8: the amount involved and the results obtained.

### 1. Factor 1: Time Reasonably Required to Litigate Issues Reasonably Presented in the Action

The first of the *Johnson* factors necessitates an examination of the time reasonably required to litigate issues reasonably presented in the action.

■ It is axiomatic that hours spent on the unsuccessful claims that are *distinct in*

---

17. Along the same line, the Defendants argue that there was not a common core of facts between the claims defeated on summary judgment and the claim on which Saleh prevailed. As explained previously, that contention is wrong and, in any event, the fees requested already have been reduced to take into account what could be considered as defeated claims distinct in all respects from the claim on which Saleh prevailed.

18. The Defendants also argue that Saleh's fee and expense petition should be denied in its entirety based on their perception that it is so excessive as to shock the conscience and because the attorneys have made no attempt to allocate time spent as between the claims filed in the complaint. As will be discussed below, the application for fees and expenses need not be equal to or below that amount

recovered by Saleh at trial and therefore, even though the fee request is higher than the judgment award, it certainly does not shock the conscience. That is especially true where, as here, the conduct in the case by the Defendants, most significantly their recalcitrance in discovery, was responsible for much of the time claimed by Saleh's counsel.

Further, the Defendants are wrong in their assertion that the attorneys need to categorize their fees by which claim in the complaint their work is associated. The Supreme Court has mandated that counsel do not need to record in great detail how each minute is expended, but at a minimum need to identify the "general subject matter of his time expenditures." *Hensley*, 461 U.S. at 437 n. 12, 103 S.Ct. 1933. The Plaintiffs have abided by this requirement.

*all respects* from the successful claims should be excluded in considering the amount of a reasonable fee. *See Hensley,* 461 U.S. at 440, 103 S.Ct. 1933. The application submitted by M & V already reflects the exclusion of fees incurred in preparing, presenting, and arguing claims on which Saleh lost at the summary judgment phase of the litigation to the extent that the factual development, and the legal grounding, of those claims were distinct in all respects from the claim on which Saleh prevailed. This is verified by detailed affidavits from M & V, as well as by a sworn independent expert opinion, who recommended a further reduction as to such claims, which was made by M & V before the submission of the fee application. And, the Court's familiarity with the case and the fee application confirm the verified record on that point. The arguments of the Defendants simply ignore those exclusions, and proceed on the assumption that they were not made.[19]

Moreover, after oral argument on the fee application, the Court directed M & V to further reduce Saleh's fee claim by deleting therefrom all fees (and expenses) incurred as to the allegedly discriminatory incidents involving the WREMCON, Natick, FHWY/Summer Transportation Institute Project, and USDA Water Quality Center projects, on which Saleh was working before June 13, 1995.[20] Claims based on those pre–1995 projects were dismissed on summary judgment as time-barred under the relevant statute of limitations, as explained in the Memorandum Opinion dated February 25, 1999.[21] Saleh argues that M & V should be compensated for the time spent to develop and present evidence about those projects because evidence of that sort was necessary to prevail on the retaliation claim.

However, evidence about the pre–1995 projects was allowed to be admitted at trial principally as to the intent element of the discrimination claim. The evidence as to the pre–1995 projects served only a marginal utility to meet the Defendants' defense to the retaliation claim and only incidentally supported Saleh's claim of retaliation. If the evidence of the pre–1995 projects had been excluded, there was sufficient other evidence that showed the context for, and the legitimacy of, the Recent Acts Paper that spawned the retaliation alleged in Count IV and that rebutted the Defendants' allegations that the statements in the Recent Acts Paper were lies. Therefore, the time spent by the attorneys and their assistants on the pre–1995 projects was not "inextricably intertwined" with the retaliation claim and therefore

**19.** The independent expert, Robert E. Eicher, Esquire, one of Virginia's most respected trial lawyers, also subtracted $17,386.50 for time spent as to claims against VSU and $4,595.00 for hours amending Saleh's complaint.

**20.** The allegedly discriminatory incidents that occurred before June 13, 1995 include: Saleh's removal from participating in the USDA Water Quality Center for Excellence at VSU project; his removal from work on the Environmental Science and Engineering Degree Program; conduct in connection with the EPA Cooperative Agreement, including VSU's withdrawal from the Water Resources and Environmental Management Consortium ("WREMCON"); his removal from work on the FHWY proposal to develop a Pre–College Science and Engineering Institute; his removal from work on behalf of the Biotechnology Research Alliance; termination of his position as contact person under the Memo-

randum of Understanding between VSU and the Department of Defense/Natick Research and Development Center; his removal from the Defense Technology Commercialization Project; the elimination of the Center for Energy and Environmental Studies; and his transfer from the Department of Agriculture to the Department of Engineering Technology.

**21.** In brief, the Court found that, because Saleh's original complaint was filed on June 13, 1997, only incidents occurring after June 13, 1995 were allowed, under Va.Code Ann. § 8.01–243, to form the basis of Saleh's § 1981 and § 1983 claims. All events prior to this time were time barred under the Virginia two-year statute of limitations. Further, as the Court found in its February 25 Opinion, the specific projects were not part of a "continuing violation." *See Fathy M.A. Saleh,* No. 3:97cv460 at 29.

must be deducted from the total fees allowed. *See Hensley*, 461 U.S. at 435, 103 S.Ct. 1933. The amount of the deduction is $88,767.85. (Declaration of Samuel M. Brock III, signed June 28, 1999).

As discussed above, M & V has already deleted from its fee application time devoted to discovering and presenting those aspects of the race and national discrimination claims that were distinct in all respects from the retaliation claim. The Court has also found, in sections 2 and 6 of the Findings of Fact section above, that part of the discovery and presentment at trial of the race and national discrimination claims involved a common core of facts as that involved in the retaliation claim. Therefore, Saleh is entitled to recover the attorneys' fees expended in relation to these common core of facts that pertained to both the retaliation and race and national discrimination claims. *See Hensley*, 461 U.S. at 435, 103 S.Ct. 1933.

■ Counsel for prevailing plaintiffs are further admonished by the Supreme Court to "make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933. Again, as affirmed by counsel at M & V under oath, and as confirmed by the independent expert opinion, reductions were made in the fee request to avoid excessive or redundant charges.

■ The consolidation of the four very similar cases brought by Saleh, Siddiqi, Upadhyay and Mbagwu forced Saleh's attorneys to incur additional fees for the time spent on briefing counsel for the other three Plaintiffs on developments made as of the point of consolidation and providing them access to, and copies from, the

extensive documentary record created on Saleh's behalf. Although typically, the briefing of new counsel on a case is not compensable under an award for attorney's fees, the time spent in this action briefing Saleh's co-plaintiffs' counsel on the discovery that they already had conducted, in the end, saved resources and time in discovery that would have occurred had the cases not been consolidated. Counsel for Siddiqi and Upadhyay have submitted affidavits attesting to the reliance that they placed in their representation of Siddiqi and Upadhyay on the discovery that M & V had already conducted for Saleh and on briefings by M & V. Therefore, Saleh's attorneys are justified in their request for the hours incurred in preventing unnecessary duplication of work already conducted because that inured to the benefit of the Defendants by reducing the fees which they would have incurred if M & V had not undertaken these efforts to avoid replication of work previously performed.

■ Also, as a result of consolidation,[22] M & V assumed the role of lead counsel in the preparation of all joint papers and in arranging coordinated non-duplicative discovery. That responsibility was very important because in many respects all four of the consolidated cases proceeded on a common core of facts and, without coordination, the expense of litigation could have been increased for all parties.

To adequately organize, and provide ready access to, the volumes of documents and depositions produced during this litigation, M & V organized a "summation" litigation management computer system. Experienced lawyers set up the system and experienced legal assistants were primarily responsible for maintaining, updating, and confirming the accuracy of this computer system. This was an

---

22. Consolidation, although supported by the Plaintiffs, was a concept initiated by the Court *albeit* strenuously opposed by the Defendants. Based on experience and familiarity with this case, the Court finds that consolidation conserved the resources of the parties and of the Court. The fee applications of separately discovered and tried cases would have greatly exceeded those made here.

efficient and organized system that saved time and effort by counsel for all the Plaintiffs, including counsel for Saleh. And, the first rate quality of the Plaintiffs' legal assistants made for efficiently conducted depositions, pretrial conferences and trial sessions. M & V is entitled to be compensated for the time devoted by lawyers and legal assistants to this aspect of their representation.

██ Saleh's counsel also have sought compensation for the time devoted to seeking this award of fees and costs, and under the law that time is compensable so long as it is reasonable. *See e.g. Trimper v. City of Norfolk, Va.,* 58 F.3d 68, 77 (4th Cir.), *cert. denied,* 516 U.S. 997, 116 S.Ct. 535, 133 L.Ed.2d 440 (1995). A review of the supplemented time entries reveals that the hours spent were reasonable, especially in perspective of the arguments raised by the Defendants in response to the fee request.

██ Another matter to be considered in assessing *Johnson* Factor 1 is the division of labor between attorneys and non-lawyers. "It is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics, and other work which can often be accomplished by non-lawyers." *Johnson,* 488 F.2d at 717. Counsel has verified and affirmed that the tasks were divided among the employees of M & V according to the level of the task needed to be done. For example, legal assistants organized documents and prepared exhibits, whereas associates performed more legal tasks commensurate with their experience, skill and hourly rate. The M & V time entries reflect a proper allocation of tasks.

## 2. Factor 2: Novelty And Difficulty Of Questions Posed By The Action

The second *Johnson* factor requires assessment of the novelty and difficulty of the questions posed by the action. Employment discrimination cases are not new either to this Court or to the lawyers involved here and, therefore, this is not a case of first impression. However, discrimination and retaliation claims often depend on circumstantial evidence, the development and integration of which generally is more time intensive than is the development of direct evidence. Although M & V developed, and presented, direct evidence of both retaliation and discrimination, much of the proof at trial came from circumstantial evidence. Hence, much of the discovery was directed to the development of pieces of circumstantial evidence and to connecting those pieces into a cohesive whole.

Further, the preparation of this case was made especially difficult as a result of the approach to discovery taken by the Defendants. As evidenced by the successful motions to compel against the Defendants, discovery was resisted, often without justification, at every step of the way. In response to the Plaintiffs' discovery requests, the Defendants were recalcitrant in producing evidence, gave incomplete responses to interrogatories, provided piecemeal production of documents, produced documents during or after depositions, thereby necessitating extra deposition sessions, belatedly handed over revisions of documents that had already been produced and relied on by the Plaintiffs, produced frivolous documents, and, on occasion, failed to appear for scheduled depositions.

The previously discussed unwarranted reliance on Rule 33 by the Defendants is another example of how the Defendants' discovery conduct led to a significant magnification of fees. Another example of the costly consequences of the unwillingness of the Defendants to fulfill their obligations in the discovery process is found in the deposition of Florence Farley, a key player in the retaliation aspect of the Saleh action. After her deposition was taken, Farley filed a Motion for Partial Summary Judgment, relying on her deposition as important evidentiary support. Only after the Plaintiffs responded to that motion did

the Defendants disclose the existence of audio tapes of meetings that showed that Farley's deposition testimony was false. The Plaintiffs' subpoenaed the tapes, had them transcribed, and filed a supplemental memorandum relying on the tapes. This episode, which alone accounted for 163 hours of time and $24,196.00 in fees, is further illustrative of how the conduct of the Defendants multiplied the amount of time (and hence fees) necessary to complete the case.

In sum, the unwillingness of the Defendants to cooperate in the discovery process caused the Plaintiffs to spend inordinate amounts of time and expense in securing information that was rightfully theirs to be discovered under the Federal Rules of Civil Procedure. This approach made the resolution of the questions posed in the action far more difficult than should have been the case. That difficulty manifested itself in the need of Saleh's counsel to spend more time in discovery, in discovery disputes, and in a virtually unprecedented number of successful motions to compel discovery.

The Defendants in response argue that "none" of the discovery requests, motions or hearings were related to the retaliation claim, and therefore, Saleh cannot rightfully recover for those hours. (Def's Response at 11). However, the Defendants are wrong in this assertion. Saleh's requests for discovery regarding the race, pay and merit evaluations of VSU faculty, which precipitated motions to compel and sanctions, are cited by the Defendants as a signal example of how Saleh's discovery was unrelated to the retaliation claim. To the contrary, those requests were relevant to Saleh's retaliation claim because he was claiming that he was retaliated against for complaining of discrimination, including, *inter alia*, pay and evaluation discrimination at VSU against not just him, but all foreign-born and white faculty members at VSU. Specific forms of that retaliation were low pay increases, foreclosure from remuneration from grants, summer school and outside contracts, and poor evaluations. Saleh needed, therefore, to discover and present at trial evidence on these topics to prove both retaliation and damages. Since the evidence of both retaliation and discrimination was from many of the same sources and took some of the same forms, it can hardly be said that the expense of conducting discovery and presenting trial evidence on these points cannot be compensable.

Finally, the prosecution of the case was made more difficult, and for the Plaintiffs more costly, by the presentation of a highly aggressive and comprehensive defense. The Defendants, of course, were entitled to mount a full scale defense if they were so advised, but, where, as here, a defense of that ilk is unsuccessful, the Defendants must pay for the fees reasonably incurred by their adversaries in meeting the defense.

### 3. Factor 8: Amount Involved And Results Obtained

*Johnson* Factor 8 directs the Court to look at the amount in controversy and results obtained. The Supreme Court has stated that the "degree of success obtained" is indeed the most "critical factor" in determining the reasonableness of the fee award. *Farrar v. Hobby*, 506 U.S. 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (citing *Hensley*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). The Defendants vigorously, but unmindful of *Hensley* and *Rivera*, argue that the fee request must be reduced simply because it is disproportionate to the results obtained. On that aspect of the Defendants' argument, the Supreme Court has held that the Defendants are wrong.

The other thesis on which the Defendants' lack of success argument rests is that, although Saleh sought $20 million in his Amended Complaint, asked for $2.2 million at the settlement conference, and, in closing argument, requested $500,000 in compensatory damages and $500,000 in punitive damages, the jury awarded only

$97,769 in compensatory damages and $19,580 in punitive damages, for a total of $117,349 in monetary damages. This, say the Defendants, illustrates a minimal success factor which, in turn, must result in a minimal fee.

There is some logical force to the argument, but it ignores the fact that Saleh's compensatory award was well within the parameters of the proven economic losses for past and future lost income, as testified to by Mr. Dave Parcell. (Pl's Ex. 88). Thus, tethered to the proof, the degree of success in the compensatory aspect of the case actually was quite good.

And, this approach to the analysis of success also ignores the fact that the punitive awards appear to have been gauged not only by the conduct of the respective Defendants, but also by their respective ability to pay. That, of course, is what the jury was told to do in the instructions. And, in any event, the *fact* of monetary punishment is often as important as the *amount* of the punishment in serving the deterrent purpose of a punitive damage award. Hence, the fact of a punitive award, significant in sum to those who must pay it (as is true here), is an indicator of success, not of failure, as the Defendants contend.

The Defendants would have success measured solely by comparing the jury award with (1) the ad damnum sum of $20 million which the jury never heard, (2) with the $2.2 million settlement demand which included attorneys fees and costs, and of which, of course, the jury knew nothing, and (3) with the sum asked for in closing argument ($500,000 each in com-

pensatory and punitive damages). That approach has the salutary effect of militating large ad damnum clauses, large settlement demands and large prayers in closing arguments. And, of course, the perception of value placed on a case by plaintiff's counsel is a pertinent factor in assessing success, *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431 (4th Cir.2000), but it is not the only one.

The amount of the ad damnum clause is a pertinent, but not very helpful measure of success because, as experience has taught us, those figures more often than not are more aspirational than factual in nature.[23] Nor does much guidance come from the Plaintiffs' high opening settlement demand in this case because the Defendants did not even make a counter-offer.[24]

The prayer in the closing argument was for a damage award of $1 million, perhaps more than prudence would have suggested, but the jury's award was reflective of the proof of economic loss offered by Saleh and, as to punishment, of the proof of the Defendants' ability to pay. Thus, when measured against the evidence, the damage award, albeit not as great as requested, reflects considerable success. And, as explained below, the results, monetary and injunctive, were successful in achieving the vindication of important civil and constitutional rights.

It is important to recall that the Supreme Court has found that, in civil rights cases, the award of attorney's fees is not to be measured solely by the amount of the monetary recovery. *City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91

23. Of course, it would be best if the ad damnum clause were less aspirational but courts should not measure success merely by aspiration. Would it be right, for example, to give a small fee to a plaintiff's counsel whose ad damnum was $75,000 and the award, based on months of discovery, was $1 million. Clearly not.

24. Here too, reality must come into play. The Court holds settlement conferences in

every civil action assigned to it. At least 80% of the time, the plaintiff's opening demand is excessive. But, in almost every one of those instances, a reasonable counteroffer yields a response that is more reflective of the true value of the plaintiff's case. Here, the Defendants simply said, "we will make no offer to Saleh." In so doing, they themselves rendered settlement assessments of very little value as a measure of success.

L.Ed.2d 466 (1986). In *Rivera*, the Supreme Court stated:

> The *amount of damages* a plaintiff recovers is certainly *relevant* to the amount of attorney's fees to be awarded under § 1988. It is, however, *only one of many factors* that a court should consider in calculating an award of attorney's fees. We reject the proposition that fee awards under § 1988 should necessarily be proportionate to the amount of damages a civil rights plaintiff actually recovers.

*Id.* at 574, 106 S.Ct. 2686 (citations omitted) (emphasis added). In explaining the rationale for this statement, the Court made clear that:

> Unlike most private tort litigants, a civil rights plaintiff seeks to *vindicate important civil and constitutional rights that cannot be valued solely in monetary terms* . . . . Regardless of the form of relief he actually obtains, a successful civil rights plaintiff often *secures important social benefits* that are not reflected in nominal or relatively small damages awards. . . . In addition, the damages a plaintiff recovers *contributes significantly to the deterrence* of civil rights violations in the future. . . . Congress expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit 'does so not for himself alone but also as a private attorney general, vindicating a policy that Congress considered of the highest importance.' . . . *Because damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief.*

*Id.* at 574–75, 106 S.Ct. 2686 (citations omitted) (emphasis added).

The eradication of retaliation for speaking out against racial and national origin discrimination is clearly an important constitutional and public goal that, in part, was achieved as a result of this litigation. Through the injunctive and punitive damage relief obtained, the Plaintiffs have furthered the policy of deterring such unlawful conduct in the future. Accordingly, the proper fee award here is not dependent solely on the amount of money damages recovered by the Plaintiffs.

At this point, it is necessary to recall what the Supreme Court has said about the situation where, as here, the plaintiff has prevailed only on a limited number of multiple counts. The Court stated:

> In [some] cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the *significance of the overall relief obtained* by the plaintiff *in relation to the hours reasonably expended* on the litigation. Where a plaintiff has obtained *excellent results*, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances *the fee award should not be reduced simply because the plaintiff failed to* prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.
>
> If, on the other hand, a plaintiff has achieved *only partial or limited success,* the product of hours reasonably expended on the litigation as a whole *times a reasonable hourly rate may be an excessive amount.* This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith.

*Hensley,* 461 U.S. at 435–36, 103 S.Ct. 1933 (citations and footnote omitted) (emphasis added); *accord Brodziak v. Runyon,* 145 F.3d 194, 196 (4th Cir.1998). The result achieved by Saleh was quite significant in terms of vindicating constitutional rights and very good in monetary terms. Although the monetary award was not excessive, the fact that, in addition to compensatory relief, both punitive damages and injunctive relief were awarded indicates that significant civil and constitutional rights were violated and needed to be vindicated.

On that point, it is important to remember why Saleh suffered the retaliation which was the basis for his successful claim. In the Recent Acts Paper, Saleh and Dr. Carey Stronach sought to document cases of discrimination against white and foreign-national faculty and staff at VSU committed between the summer of 1993 and July 1995 by the executive leadership at VSU. Within the report were allegations of discriminatory actions related to, *inter alia,* the choosing of the heads of the university's restructuring committees; the appointment of department chairs, unit directors, committee chairs, and deans; the stifling of foreign national or white faculty members' pursuit of research projects, grants, and centers; and discriminatory pay practices.

Saleh thus spoke out on matters of significance to members of the academy, both at VSU and generally. And, those topics are important to faculty members at both private and public universities. The jury found that, as the consequence of Saleh's conduct in voicing his opinions about these important matters, the Defendants retaliated against Saleh by giving him poor evaluations and low salary increases, interfering with his ability to obtain grants for the Natural Resources Research Institute and for the Pre-college Science and Engineering Technology Institute and thereby preventing him from earning summer pay, preventing him from performing research or obtaining outside consulting work with the Resource Group of Virginia, Inc., reporting him to the state police over the summer pay dispute, and, as to Mr. Moore and Dr. Farley, attempting to deprive him of tenure. *See* Jury Instruction No. 32. In the academy, these are extremely serious forms of retaliation.

The jury reacted by awarding monetary compensation to Saleh. But, it also reacted by imposing monetary punishment. Further, an injunction was issued against the Defendants. Although the injunctive relief was tailored to protect Saleh as an individual, the injunctive relief which he obtained reasonably can be expected to protect other faculty members at VSU from retaliation for having exercised their First Amendment rights to identify and to seek the eradication of discrimination.

It was these people—the chief and senior executives of VSU—who were ordered to compensate Saleh, who were assessed monetary punishment, and who were enjoined. Having been thusly chastised and enjoined, it is reasonable to expect that the discriminators will refrain from similar conduct as to other faculty members who speak out against discrimination at VSU. Thus, the result in Saleh's case also has results that transcend the particular injury to Saleh.

Further, the jury's verdict and the injunction in this action, directed, as they were, against the leader and senior executives of a well-known university, no doubt will signal to university administrators throughout the Richmond Division, and, indeed, in the Eastern District of Virginia, that presidents, provosts and deans of universities, both public and private, must expect that their wrongs will be punished and that they, personally, will be required to make whole those whom they have injured and to pay the assessed punishment. And, the executives of universities will know that they personally will suffer the inevitable opprobrium that attends a published finding that they have violated the law and therefore have been ordered by a court to refrain from further violative con-

duct. In those ways, the *in terroram* effect of the results obtained by Saleh can be expected to reach well beyond the named Defendants.

■ Thus, here, it truly can be said that the results obtained by Saleh not only provided compensation for the violation of his civil rights, but served a significant public interest, vindicating for others one of the most treasured rights of an American citizen employed by a public body—the right to speak truthfully about a matter of public interest without facing retaliation.

Of course, the decision in *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 766–67 (4th Cir.1998), *modified*, 206 F.3d 431 (4th Cir.2000), teaches that the degree of success calculus must take into account the total number of claims and how they fared on summary judgment and at trial. Accordingly, although the overall results obtained by Saleh's counsel are highly significant, both economically and equitably, and even given the reductions thus far made to reflect the claims on which Saleh did not succeed and which were completely unrelated to that on which he did succeed, it is necessary to further reduce the fee award to assure that fee compensation is reasonably tailored to the success achieved.

Considering the overall value of the monetary award, and the fact of punishment and injunctive relief, the Court is of the view that an appropriate fee in the Saleh case is $750,000.[25] That, of course, is about seven times the size of the monetary recovery. But, the fact of

punishment and the injunction renders the success factor here of great value in vindicating constitutional and civil rights. Furthermore, the Defendants made it necessary for the Plaintiffs to use extensive legal resources to secure compensation, to impose punishment, and to vindicate an important constitutional right. This across the board reduction is supported by *Hensley*, 461 U.S. at 436–37, 103 S.Ct. 1933, wherein the Supreme Court held that the district court "may simply reduce the award to account for the limited success." The previous reduction of $295,495.35 reflects adjustments for unsuccessful claims not sufficiently related to successful claims to qualify for a fee award. This additional adjustment (a further reduction of $148,662.74) under the guidance of *Lowery*, adequately adjusts the fee award to appropriately compensate Saleh's attorneys for the success that they, in the end, achieved in the Saleh case.

The Defendants argue that this case is controlled by the decision in *Hetzel v. Prince William County*, 89 F.3d 169 (4th Cir.), *cert. denied*, 519 U.S. 1028, 117 S.Ct. 584, 136 L.Ed.2d 514 (1996).[26] To the contrary, Saleh's case is significantly unlike *Hetzel*, because, unlike in *Hetzel*, Saleh sought and received injunctive vindication of public rights as well as compensation for his own injuries. And, unlike in *Hetzel*, Saleh was awarded punitive damages. And, unlike in *Hetzel*, Saleh actually recovered, and so far has kept, a

---

**25.** That reduces the fee by an additional amount of $148,662.74.

**26.** In asserting that Saleh failed to achieve success in his litigation, the Defendants also cite to *In re Board of County Supervisors of Prince William County, Virginia*, 143 F.3d 835 (4th Cir.1998), a decision that stems from the litigation dealt with by the Fourth Circuit in *Hetzel v. Prince William County*, 89 F.3d 169. However, in *In re Board of County Supervisors of Prince William County, Virginia*, the Fourth Circuit explained and modified an earlier unpublished order in light of the Supreme

Court's ruling in *Hetzel v. Prince William County*, 523 U.S. 208, 118 S.Ct. 1210, 140 L.Ed.2d 336 (1998), and held that the district court would be ordered upon remand to closely examine certain comparable awards, to recalculate damages, and to offer the employee the choice of accepting the reduced award or proceeding to new trial. Therefore, this decision provides no guidance to the Court on the issue of attorney's fees and whether Saleh can be considered to have successfully prevailed in his litigation.

significant, albeit not excessive, compensatory award.

Finally, it is necessary to address the Defendants' argument that Saleh is entitled to no fee award at all under the decision *Fair Housing Council v. Landow*, 999 F.2d 92 (4th Cir.1993) and *Sun Publishing, Inc. v. Mecklenburg News, Inc.*, 823 F.2d 818 (4th Cir.1987). *Landow* simply does not apply here. Indeed, given the well-documented fee application, it was frivolous to have cited to it. Also, unlike *Landow*, for the reasons set forth above, the fee application does not shock the conscience of the Court. And, here Saleh secured significant success, whereas the plaintiff in *Landow* did not.

In *Sun Publishing*, the Fourth Circuit affirmed the denial of the plaintiff's second supplemental petition for attorney's fees. The district court had already awarded approximately $300,000 in fees as requested in the initial and supplemental petition, and found the third petition simply unconscionable. While there have been three fee applications in this action, the hours reflected in the applications do not represent time spent as to one motion and one hearing involving "one simple issue" as was the situation in *Sun Publishing*. 823 F.2d at 820. Rather, here, as evidenced by the Affidavits filed by James S. Crockett, Jr. and the supplementing time sheets, the second two fee requests involved time spent as to Saleh's motion for equitable relief, the fee application, and the Defendants' Motion for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial or Remittur, all of which were matters not claimed in the first fee application. Therefore, *Sun Publishing* also does not apply here.

For the foregoing reasons, the fee application submitted by counsel for Saleh is approved in the amount of $750,000.

---

**27.** Mbagwu's Complaint contained four claims, three of which were dismissed on

## IV. Mbagwu's Application For Fees

### A. Reasonableness Of Rates

The Defendants do not contest the reasonableness of the hourly rates submitted by counsel for Mbagwu.

### B. Number Of Hours Reasonably Expended

The fee applications submitted by M & V, as co-counsel for Mbagwu, request a total award of fees in the amount of $293,542.75. Mbagwu's attorneys at M & V have submitted time sheets reflecting a total of 1,154.6 hours worked by six attorneys and 599.7 hours in paralegal services.

The fee applications submitted by ML & P, as counsel for Mbagwu, seek a total award of $167,924.00 in attorney's fees. Mbagwu's five attorneys at ML & P have documented a total of 841.9 hours spent on his case, and 26.9 hours in paralegal services.

The three Johnson Factors discussed at length in relation to the Saleh fee application (see pp. 34—55, *infra*) apply equally to Mbagwu, with the exception that Mbagwu prevailed on the only claim that he presented to the jury and he presented fewer claims that did Saleh.[27] Hence, the discussion of *Johnson* Factors 1, 2 and 8 is incorporated here. Moreover, the Defendants do not oppose the fees requested by Mbagwu's counsel except to assert that there should be a reduction for: (1) hours spent on unsuccessful claims; (2) duplication of counsels' efforts; and (3) paralegal's excessive time. Those objections will be considered in turn.

### 1. Fees Incurred On Unsuccessful Claims

Contrary to the Defendants' contention, the Court is satisfied that the hours submitted by M & V and ML & P already reflect exclusions of fees incurred in presenting and arguing claims on which

---

summary judgment.

Mbagwu did not prevail.[28] This is verified by counsel under oath, as well as an independent expert opinion. A review of the fee application confirms these averments. The Defendants offer no evidence to the contrary. Nor have they even identified specifically what reductions they think should be made.

As to the claim that there should be further reduction for the unsuccessful racial discrimination claim, it must be remembered that the evidence and discovery related to, and connected with, the national origin discrimination claim on which Mbagwu prevailed included the pay and evaluation system at VSU and other evidence as to discriminatory practices engaged by the Defendants. It is true that Mbagwu's racial discrimination claim was dismissed on summary judgment, but that was because the racial discrimination was an ethnicity claim and thus, in actuality, was a national origin discrimination claim. Moreover, Mbagwu's racial and national discrimination claims depended on the same nexus of facts as to liability and damages. The work done by Mbagwu's counsel as to the racial discrimination claim was necessary to present the discrimination claim on which he ultimately did prevail. The work which was reasonably expended on the national origin discrimination claim on which he did prevail at trial was inextricably connected to the racial discrimination claim.

Finally, all that was said in the discussion of Saleh's fee claim about the fee consequences of the Defendants' approach to discovery and to the defense of the case generally is equally applicable here, but there is no need to repeat it. Suffice it to say that the Defendants resisted Mbagwu's claim just as vigorously as they did

Saleh's and with the same fee and expense consequences.

## 2. Duplication Of Counsels' Efforts

The Defendants also argue that a reduction should be made in Mbagwu's fee award to reflect the duplicative efforts made as a result of two law firms representing Mbagwu. Examples to which the Defendants point are the five attorney team that spent time preparing the complaint filed on behalf of Mbagwu, the several conferences among Mbagwu's attorneys, and the five attorneys who billed trial time on behalf of Mbagwu.

In arguing that M & V should be awarded fees to recover as to Mbagwu, M & V asserts that it served as lead counsel in preparing multiple joint submissions filed on behalf of all Plaintiffs in the consolidated cases which, of course, involved performing services that benefitted Mbagwu.[29] And, at the hearings and trial, M & V presented much evidence and argument that benefitted both Mbagwu and Saleh.

M & V has provided detailed descriptions of how the attorneys in its office and those at ML & P divided their time and efforts on Mbagwu's case so as to avoid duplicative services. Both law firms actively worked on the documents submitted (*i.e.* the complaint and the responses to the motions to dismiss and for summary judgment), however, the firms attest that the necessary research and drafting for these documents were not duplicated. The complaint was primarily prepared by ML & P, which billed 34 hours for that task, whereas M & V expended 11.0 billable hours in revising and reviewing the draft. The brief presented in opposition to the Defendants' Motion for Summary Judgment was a joint argument for all four of the Plain-

---

**28.** That includes Mbagwu's state law claim for conspiracy to injure in reputation, trade, business, or profession, in violation of Va. Code §§ 18.2–499 & 500, which was dismissed on summary judgment.

**29.** These submissions include: (1) settlement proposal; (2) liability statement submitted in

connection with the mandatory settlement conference; (3) Plaintiff's Consolidated Brief Opposing Individual Defendants' Motion for Summary Judgment; (4) Plaintiffs' Proposed Exhibit List and Witness List; and (5) Final Pretrial Order.

tiffs, and, accordingly, as the lead counsel in the consolidated case, M & V spent more efforts in preparing the submission than ML & P, especially considering that the lead attorneys from ML & P were unavailable because of other commitments. At the hearing on the summary judgment motion, the M & V attorney who argued the case presented arguments and factual background that were also necessary for Mbagwu's case, and precluded the need for the ML & P attorney who actually spoke on behalf of Mbagwu from repeating this information.

As to the time spent at the trial, M & V correctly points out that much of the discrimination evidence presented by it was pertinent to, and supported, both Saleh's and Mbagwu's claims; and, therefore, the time spent at trial by M & V was divided equally between Mbagwu and Saleh's billing sheets. For the post-trial motions, again, like the response to the summary judgment motion, the Plaintiffs submitted a joint response on which ML & P spent considerable time drafting the initial sections for Mbagwu. However, M & V spent significant time combining the sections, making editing and stylistic changes necessary when two parties work together on a brief.

Counsel for Mbagwu have met their burden of adequately explaining and defending the time they have billed in their representation of Mbagwu. They have meticulously detailed how their time did not overlap or duplicate work already done. The Defendants have not shown otherwise. Accordingly, the Court finds that there was no duplication of counsels' efforts and the time submitted is properly recoverable.

### 3. Legal Assistants' Time

The Defendants also object to the fees requested as a result of work conducted by legal assistants. They contend that compensation should not be awarded for time spent by the legal assistants attending trial, reviewing documents, and pre-

paring for depositions. It is well-settled that, in a § 1988 fee request, time reasonably expended by legal assistants is recoverable. *See Spell v. McDaniel*, 852 F.2d 762, 770 (4th Cir.1988). Having reviewed the time entries, the Court is convinced that the charges are appropriate and are of the type typically billed to a client. The legal assistants were actively engaged in maintaining the computer database prepared to store the evidence, assisted in organizing the documents and coordinating witness appearances at trial, and preparing deposition and trial evidence notebooks, all of which is work typically carried out by legal assistants. Moreover, the work accomplished by the legal assistants before, and during, the trial was a model of organization and efficiency. And, it contributed significantly to the effective and efficient handling of documents and depositions at trial.

In sum, the Court is satisfied that the time component of the fee request reasonably reflects the time reasonably necessary to litigate this action successfully.

### C. Results Obtained

Mbagwu's results were excellent when measured against the proofs and when considered as a whole. He was awarded compensatory damages supported by the proof offered by his expert, Mr. Parcell. He was awarded punitive damages commensurate with the ability of the respective Defendants to pay. And, he, like Saleh, was awarded an injunction that, although tailored to him, will inure to the benefit of other faculty members at VSU as well as to the benefit of faculty at other institutions of higher learning.

On that point, it is relevant to recall that the evidence which produced the verdict and the injunction in Mbagwu's favor showed intentional national origin discrimination at the highest levels of VSU. Indeed, the discrimination started with Moore, the President, ran through the highest chief academic level, Dawson, the

Provost, to the Dean of the School, Lyons, to the Department Head, Epps.

The award of compensatory and punitive damages against these university executives for their reprehensible national origin discrimination will serve notice to executives of universities, public and private alike, that engaging in discriminatory conduct will cost them. And, the injunction secured by Mbagwu likewise will serve to notify those who run universities, public and private, that they will be branded as discriminators, a loathsome appellation, if, as did the Defendants here, they discriminate against members of their faculty.

Hence, just as was true in Saleh's case, the relief obtained by Mbagwu vindicates important constitutional and public goals and extends far beyond the benefit Mbagwu secured for himself.[30]

For the foregoing reasons, the fee application submitted by M & V for Mbagwu is approved in the amount of $293,542.75, and for ML & P in the amount of $167,924.00.

## V. Other *Johnson* Factors: Saleh And Mbagwu Fee Applications

### A. Level Of Skill Required To Perform The Legal Services Properly

*Johnson* Factor 3, the level of skill required to perform the legal services properly, is in part dependent upon the novelty and difficulty of the questions raised by the litigation, which has been addressed above. The level of skill displayed at trial by the lawyers for M & V and ML & P was quite high. Their written work and oral presentation were also of high quality. The case was a difficult one because of the need to accumulate, organize and present the circumstantial evidence to accompany the direct evidence of retaliation, as to Saleh, and national origin discrimination, as to Mbagwu. Furthermore, the conduct of the Defendants in discovery and the staunch across-the-board defense called

for skillful substantive and procedural remedial action and counter-measures to adequately represent the interests of Saleh and Mbagwu.

Finally, it is significant to note that the senior lawyers properly delegated responsibility to junior lawyers and legal assistants where that could be done. This resulted in fees that were considerably less than could have been expected absent the delegation manifested in the billing records and in the affidavits supporting the fee application.

### B. Preclusion Of Employment

*Johnson* Factor 4 examines the preclusion of employment by the attorneys due to acceptance of the case. Counsel for the Plaintiffs have attested that they were forced to decline other requests for representation due to both the conflict of interest concerns which would occur from such representation as well as the lack of time to devote to other causes as a result of the time spent on the Plaintiffs' behalf. Hence, this factor supports the reasonableness of the fee which was claimed by counsel for both Saleh and Mbagwu.

### C. Customary Fee In Similar Cases

*Johnson* Factor 5 directs the Court to measure the requested rate against the prevailing market rates in the relevant community. *See Rum Creek,* 31 F.3d at 175. The relevant market to be used in this determination is "ordinarily the community in which the court where the action is prosecuted sits." *Id.* The prevailing rate is "best guided by what attorneys earn from paying clients for similar services in similar circumstances." *Id.* Further, "[t]he prevailing market rate may be established through affidavits reciting the precise fees that counsel with similar qualifications have received in comparable

---

**30.** No further success adjustment is required for the Mbagwu fee application because his case, like *Hensley* and *Rivera,* manifests a high level of success. And, except as disposed of in sections IV, B, 1–3 above, the Defendants do not even press a success adjustment.

cases." *Spell v. McDaniel,* 824 F.2d 1380, 1402 (4th Cir.1987).

According to this decisional law, the relevant market is the Richmond area and the Eastern District of Virginia, which are the communities in which this Court sits and where the action was litigated. One of the experts consulted as to the fees requested, states:

> The ranges of fees for plaintiffs' counsel, $185.00—$230.00 for [M & V] and for [ML & P] partners, $105.00—$165.00 for associates and of counsel lawyers, and $50.00—$95.00 for paralegals, are within the customary and accepted rates for law firms undertaking employment discrimination cases in the Richmond legal market and are within the range of market rates for attorneys with comparable experience to plaintiff's counsel. The rates charged for paralegals are also within the customary and accepted rates for law firms undertaking employment discrimination cases in the Richmond legal market.

(Declaration of Harris D. Butler, III in Support of Attorneys Fee Application, at ¶ 13). The lawyers involved in this litigation have also attested that the hourly rates charged in this case were the same as their respective firms charge and receive from clients for similar services. (Declaration of James S. Crockett, Jr., at ¶ 12; Declaration of Beverly C. Powell, at ¶ 32).

An additional indication of the discretion used by the Plaintiffs' counsel in their request is the allocation of fees depending upon in which year the services were rendered. Rather than billing all of the services at their current rates, the attorneys have used the historical rates in effect at the time of service.

The Court is satisfied that the rates requested here are squarely within the rates charged by lawyers who engage in employment discrimination litigation in Richmond and this district.

### D. Contingent Or Fixed Fee

*Johnson* Factor 6, whether the attorney is working on a fixed or contingent fee basis, is helpful to assess the attorney's fee expectations when he accepted the case. *See Johnson,* 488 F.2d at 718. Here, the contingency fee arrangements entered into between the attorneys and clients were that the attorneys would receive the greater of either: (1) the Court awarded attorney's fees, or (2) 33–1/3% of any and all amounts recovered in a judgment award or in settlement obtained. Therefore, the attorneys' expectations were not limited by a specific amount.

### E. Time Limitations Imposed

*Johnson* Factor 7, the time limitations imposed by the client or the circumstances, was not involved in this action.

### F. Experience, Reputation And Ability Of The Attorneys

*Johnson* Factor 9, the experience, reputation and ability of the attorneys, is clearly presented in the resumes and affidavits filed in conjunction with the motions. The qualifications of counsel therein demonstrated warrant the rates used to calculate the fee application.

### G. Undesirability Of The Case

Factor 10 in the *Johnson* analysis requires the Court to consider the undesirability of the case. This case involved claims of retaliation and national origin discrimination against tenured professors of diverse national backgrounds by the American-born, black leadership of the nation's first state supported historically black college. The school is well-known in the area. These facts made the representation fraught with the risk of criticism against the law firms representing the Plaintiffs. Further, prosecution of an action against defendants whose defense is funded by the State is a daunting task. The defense launched by the Defendants here proves the point because it was extensive and bitter and was conducted

largely without apparent consideration of settlement with these two Plaintiffs. Those facts make taking on representation of this sort less desirable and more risky than when the opposing party can be expected realistically to assess its risks and is, therefore, more likely to be amenable to resolution by compromise. The fact of the matter is that Saleh and Mbagwu likely could not have achieved the successful results they secured if they had not had the resources of a large law firm to withstand the extensive defense mounted by the Defendants.

### H. Nature And Length Of Professional Relationship

*Johnson* Factor 11, the nature and length of the professional relationship with the client, is not applicable here as this was the first professional relationship that the lawyers and clients shared.

### I. Fee Awards In Similar Cases

*Johnson* Factor 12 requires the Court to examine fee awards granted in similar cases. Neither party offered evidence on this point. And, there would seem to be no issue in the Mbagwu case.

As to the Saleh award, the defense tactics used in this litigation make it difficult to compare this fee award to other awards obtained in civil rights cases. However, the award requested by Saleh is supported by the decisional law upholding attorney's fee awards in civil rights litigation, even though the attorney's fees are greater than the monetary damage awards. *See e.g. City of Riverside*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466. Further, the reductions made by Saleh in his fee request, both on his own initiative and at the request of the Court, as well as the further reduction made by the Court as a result of the partial success that he obtained at trial, is consistent with that made by other district courts in considering fee awards granted in civil rights litigation. *See e.g., Schultz v. Amick*, 955 F.Supp. 1087, 1111–1117 (N.D.Iowa 1997).

### VI. Conclusion—Attorney's Fees

In assessing all of the *Johnson* factors, the Court finds that the hourly rates and the hours expended by Plaintiffs' counsel, as reduced, are reasonable.

Therefore, the award of $750,000.00 in attorneys' fees to M & V for their representation of Saleh is a reasonable award in this action. This figure was tabulated as follows:

| | |
|---|---|
| Application No. 1 | $946,726.59 |
| Application No. 2 | $ 14,183.00 |
| Application No. 3 | +$ 26,521.00 |
| (Total) | $987,430.59 |
| Expert's Reductions | -$ 4,595.00 |
| (Total Fee Request) | $982,835.59 |
| Court's First Reduction | -$ 88,767.85 |
| (Total) | $898,662.74 |
| Court's Second Reduction | -$148,662.74 |
| Total Final Fee Award | $750,000.00 |

For their representation of Mbagwu, M & V has shown to the satisfaction of the Court that they are entitled to recover $293,542.75 in attorney's fees. This figure was tabulated as follows:

| | |
|---|---|
| Application No. 1 | $270,041.25 |
| Application No. 2 | $ 12,335.00 |
| Application No. 3 | +$ 11,621.00 |
| (Total) | $293,997.25 |
| Expert Reductions | -$ 454.50 |
| Total Final Fee Award | $293,542.75 |

And, the award of $167,924.00 in attorney's fees to ML & P is likewise reasonable. This figure was tabulated as follows:

| | |
|---|---|
| Application No. 1 | $153,046.50 |
| Application No. 2 | $ 1,153.00 |
| Application No. 3 | +$ 13,724.50 |
| Total Final Fee Award | $167,924.00 |

### VII. Litigation Expenses And Taxable Costs

Under § 1988, prevailing parties are also entitled to have their reasonable litigation expenses reimbursed. *See Daly v. Hill*, 790 F.2d 1071, 1084 (4th Cir.1986). These expenses embrace those of a type typically billed to clients and may include

the attorney's travel expenses. *See Id.* at 1084 n. 18; *Herold v. Hajoca Corp.*, 864 F.2d 317, 323 (4th Cir.1988). The Defendants have conceded that the cost request for Mbagwu is reasonable and they raise no objections thereto. The expenses incurred by ML & P for their representation of Mbagwu is $1,715.26. The expenses incurred by M & V for their representation of Mbagwu is $42,375.50.[31]

However, the Defendants, using the same arguments as they lodged for Saleh's fee request, object to the cost request submitted by Saleh. In making this objection, the Defendants neither make any particularized argument nor provide any supporting documentation explaining why Saleh's cost request should be denied.

After reviewing Saleh's supporting documentation, the Court finds that, in submitting the expenses that were incurred in litigating Saleh's case, Saleh's attorneys have exercised sound judgment. They have deleted from their request any expenses associated with the pre–1995 projects and have reduced their request consistent with the recommendations of the expert. For the same reasons articulated above in conjunction with the Defendants' arguments against the fee request, the cost request is reasonable and M & V is entitled to $63,259.48 in costs.[32]

## VIII. Rule 37 Sanctions

Although the Court may have erred in not awarding Rule 37 sanctions at the time the motions were granted, no sanctions

will be granted here. However, the amount of time spent prying discovery out of the Defendants necessarily increased significantly the amount of recoverable fees and, therefore, the relief requested by the Plaintiffs as a result of the abuses of the discovery process are reflected in the attorneys' fee award granted in this order.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for Attorneys' Fees and Costs is granted. The Saleh Defendants are jointly and severally liable to M & V for a total of $750,000 in attorneys' fees and $63,259.48 in costs. The Mbagwu Defendants are jointly and severally liable to M & V for a total of $293,542.75 in attorneys' fees and $42,375.50 in costs, and to ML & P for a total of $167,924.00 in attorneys' fees and $1,715.26 in costs.

Upon the agreement of counsel for the Plaintiffs, the execution of this decision, however, is stayed pending the resolution of the appeal of the merits of the case.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

---

**31.** This amount was calculated as follows: The initial expense request for Mbagwu was $4,560.00. This amount was reduced by $683.75 to reflect the recommendations of Mr. Eicher regarding a reduction in copying and delivery charges. However, as a result of the re-allocation of costs from Saleh to Mbagwu, M & V added $38,498.46 to Mbagwu's request, resulting in a total of $42,375.50.

**32.** This amount was calculated as follows: The initial expense request was for $156,661.01. From this, M & V deleted $22,792.27 which had been reimbursed by Siddiqi and Upadhyay. M & V further reduced the total by $12,438.24, consistent with the recommen-

dation given by the fee expert, Mr. Eicher. Mr. Eicher had recommended that M & V reduce the expenses submitted as to charges incurred for in-house copying, automated research, local deliveries, and meals. M & V next reduced the total by $15,095.41 to reflect the expenses incurred related to the pre–1995 projects. A deduction of $4577.15 was also made for unspecified purposes. The final adjustment made by M & V was a re-allocation of expenses from Saleh to Mbagwu, thereby deleting from Saleh's expense request $38,498.46. As a result of these deductions, the final expense request for M & V as to the Saleh case is $63,259.48.