**David GRAHAM, Plaintiff,**

v.

**PACTIV CORPORATION BENEFITS COMMITTEE, and Pactiv Retirement Plan, Plan No. 031, Defendants.**

**No. CIV.A. 3:03CV169.**

United States District Court,
E.D. Virginia,
Richmond Division.

Jan. 22, 2004.

Lisa K. Lawrence, Esquire, Susan G. Smith, Esquire, Todd M. Gaynor, Esquire, Lawrence & Associates, Richmond, VA, for Plaintiff.

Jay P. McElligott, Jr., Esquire, McGuireWoods LLP, Richmond, VA, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

On February 19, 2003, David Graham ("Graham") filed this action against defendants Pactiv Retirement Plan, Plan No. 031 (the "Pactiv Plan") and the Pactiv Corporation Benefits Committee (the "Pactiv Benefits Committee"), seeking redress for several alleged violations of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* The Pactiv Plan is a detailed employee benefits plan governed by ERISA. The Pactiv Plan is funded by the employees of various companies, including the Packaging Corporation of America ("PCA") which was Graham's employer when he retired in 2001. The Pactiv Benefits Committee is a board of individuals that act as fiduciaries for the Pactiv Plan. In addition, the Pactiv Benefits Committee

functions as administrator for the Pactiv Plan.

Count One of Graham's Complaint alleges that the Defendants violated ERISA by failing to provide Graham with the full amount of benefits to which he is entitled. Count Two alleges that the Defendants should be estopped from denying Graham certain benefits under the Pactiv Plan. Count Three seeks damages against the Defendants under ERISA 29 U.S.C. § 1332(c)(1) which provides that, if an administrator fails to provide requested information within thirty days, it may be liable to the participant in the amount of up to $100 per day. Count Four alleges that the Defendants breached their fiduciary duties under ERISA. After the conclusion of discovery, the Defendants filed a motion for summary judgment pursuant to Fed. R. Civ. Pro. 56. For the reasons stated below, the motion is granted.

### STATEMENT OF FACTS

The facts in this case span a forty-year time period and involve several corporate reorganizations, several pension plans and numerous communications between several parties. Hence, a somewhat detailed recitation of the facts is necessary to an understanding of the issues that control resolution of the motion for summary judgment.

### I. The Background of Graham's Employment and the Creation of the Pertinent Pension Plan

Graham began working for the Dixie Container Company ("Dixie") in 1960 at its Richmond, Virginia plant. Initially, Graham worked as an hourly production employee. Dixie, however, eventually promoted Graham to a salaried position, at which time he became an active salaried participant in the Dixie Container Pension Plan (the "Dixie Plan").

In the early 1990s, PCA, then a subsidiary of Tenneco Incorporated ("Tenneco"), acquired Dixie. As a result of this acquisition, on January 1, 1992, all Dixie employees became employees of PCA.[1] When the acquisition of Dixie by PCA took effect on January 1, 1992, the former active salaried employees of Dixie, including Graham, became eligible to participate in the Tenneco Incorporated Retirement Plan (the "Tenneco Plan").[2]

On January 1, 1994, the assets and liabilities of the Dixie Plan were merged into the Tenneco Plan. The merger resulted in the addition of Special Appendix XLIV to the Tenneco Plan document. Special Appendix XLIV provided that the Dixie Plan was frozen on December 31, 1991 and that affected former Dixie employees became participants in the Tenneco Plan as of January 1, 1992. Special Appendix XLIV further provided that affected former salaried employees of Dixie had an accrued benefit under the Tenneco Plan equal to their benefits under the then-frozen Dixie Plan plus the benefits accrued thereafter under the separate Tenneco Plan. As a result of the 1994 merger of the Dixie Plan and the Tenneco Plan, Graham received a copy of the 1995–1996 Tenneco Summary Plan Description ("SPD"). *See generally* 29 U.S.C. § 1022(a) ("A summary plan de-

---

1. In order to become a PCA employee, Graham was required to fill out a new employment application and go through a new hiring process. *See* Def. Ex. PCA–1. This hiring process, however, appears to have been a mere formality.

2. In an effort to inform former Dixie employees of their rights and obligations under the Tenneco Plan, in late 1991, immediately before the Dixie to PCA transition took place, representatives of Tenneco and PCA held meetings with Dixie employees at the Richmond plant. Although Graham admitted in interrogatories that he attended one of these meetings, he maintains that he does not recall the specific details of the presentations. *See* Def. Ex. 6.

scription of any employee benefit plan shall be furnished to participants and beneficiaries."). He did not, however, receive a copy of Special Appendix XLIV.

Then, effective April 1, 1999, Tenneco sold its corrugated container business to Madison Dearborn Partners, which retained the name PCA. This asset sale included the Richmond plant. On November 4, 1999, the remaining packaging operations of Tenneco were spun-off as a separate corporation named Pactiv Corporation.[3] On April 12, 1999, Tenneco, PCA, and Pactiv Corporation entered into an employee benefit plan arrangement. As a result of this arrangement, PCA salaried employees, such as Graham, continued to participate in the Tenneco Plan which was renamed the Pactiv Plan. In addition to this name change, the Tenneco, PCA, and Pactiv Corporation arrangement resulted in the creation of the Pactiv Plan Document, which specifically preserved all benefits and services under the terms of the Tenneco Plan, unless such benefits and services were expressly modified in the Pactiv Plan. It is undisputed that the Pactiv Plan made no changes in Graham's pension benefits.

As was true with the Tenneco Plan, an SPD summarized the Pactiv Plan. Graham, however, did not receive a copy of either the Pactiv Plan Document or the Pactiv SPD at the time of the Tenneco spin-off.

## II. Graham's Decision to Retire

Graham continued his employment with PCA into the new century. In early 2001, however, Graham began to contemplate retirement. To this end, on January 11, 2001, Graham telephoned the Pactiv Benefits Center in order to obtain a pension estimate. Hewitt Associates ("Hewitt"), an independent entity retained by the Pactiv Benefits Committee, maintains and staffs the Pactiv Benefits Center, providing information about the Pactiv Plan to its members.[4] In response to Graham's request for specification of his retirement benefits, Hewitt sent him a Pension Estimate Statement, dated January 12, 2001, which, among other pension options not here relevant, described a single life annuity of $1,107.43 per month. See Def. Ex. M–13. This estimate set forth an assumed retirement date of August 1, 2002 and explicitly stated that it was based on ten years and seven months of participation in the Tenneco/Pactiv Plan.[5] Graham took no action at this time.

On June 11, 2001, both Graham and his wife, Anita Graham ("Mrs.Graham"), again seeking pension information, communicated by telephone with the Pactiv Benefits Center.[6] The Pactiv Benefits Center recorded and later transcribed this conversation. During this telephone conversation, a Hewitt representative stated that a Ben-

3. Pactiv Corporation, a manufacturer of specialty packaging products, is headquartered in Lake Forest, Illinois. Pactiv Corporation now sponsors Pactiv Retirement Plan No. 031 and appoints members to the Pactiv Corporation Benefits Committee; the Pactiv Corporation, however, is not a party to this action.

4. Hewitt also maintains an automated telephone system that responds to inquiries from Pactiv Plan participants with recorded messages and computer-generated pension estimates. Although it manages informational services with respect to the Pactiv Plan, Hew-

itt has no authority to determine plan benefits or to otherwise construe the plan. All parties agree that Hewitt is not a fiduciary under ERISA and is not otherwise potentially liable under that statute. Thus, Hewitt is not a defendant in this action.

5. As will become evident, this was a fairly accurate statement of the pension benefits actually available to Graham under the express terms of the Pactiv Plan.

6. Like her husband, Mrs. Graham was also employed by PCA at the Richmond plant.

efit Estimate Form would be prepared and mailed to Graham. The Hewitt employee also suggested that, if Graham wanted a more immediate estimate, he should resort to Hewitt's automated phone system. Taking this advice, Graham placed a telephone call to the automated system later that same day. The computer recording provided Graham with an estimated single life annuity payment of $2,734.11 per month commencing on October 1, 2001, an amount more than double the estimate made in the previous communication on January 11, 2001. Graham placed several more calls to the automated system on June 11, 2001; in fact, all told, Graham called the system seven times that day. In each call, the automated system provided Graham with a single life annuity pension estimate in the neighborhood of $2,700 per month.

Three days later, on June 14, 2001, Graham and his wife again telephoned the Pactiv Benefits Center and spoke to a Hewitt representative. Again, Hewitt recorded and later transcribed this conversation. Mrs. Graham informed the Hewitt representative that she and her husband had yet to receive the Benefit Estimate Form that they had been promised on June 11. Mrs. Graham also indicated that, although her husband was considering retirement, he did not want to retire thinking that he would receive $2,700 per month from his pension only to later learn that this figure was erroneous. Mrs. Graham stated:

> [W]hat we're trying to find out is ... to make sure how much money he's going to get a month before he did file his

[retirement] paperwork because that's why we wanted it in writing ... what he's going to get a month so that we can make sure that he can go ahead and retire because financially we don't want him to walk out and then if these figures be incorrect and then they send us a check for $800 or $900.

Def. Ex. M–16 (ellipses in original). The Hewitt representative, however, again estimated that a single life annuity for Graham would yield approximately $2,700 per month. The representative also stated that this estimate was based on thirty-five years of participation with the Pactiv Plan. *Id.*

On June 22, 2001, Graham and his wife called the Pactiv Benefit Center two times; and, again, these conversations were recorded and later transcribed.[7] During the second conversation of June 22, Mrs. Graham repeatedly asked whether the amount of the pension could change, stating: "I just don't want something to happen and ... You know what I am saying? And somebody comes back and say, 'Oh, well we made a mistake. You should get less than that. You're only going to get half than that.'" Def. Ex. M–19 (ellipses in original). The Hewitt representative, however, assured Mrs. Graham that once Graham submitted his retirement papers, the amount would be "locked in." *Id.* Moreover, the Hewitt representative assured Mrs. Graham that her husband had accrued the maximum amount of benefits to which he was entitled; and that, even if Graham did not retire for several more years, he would not receive a larger pension.[8]

---

7. It is undisputed that neither Graham nor his wife ever informed Hewitt of the pension estimate of $1,107.43 per month supplied on January 12, 2001. Nor is there evidence that either of them ever informed Hewitt that Graham had participated in the Pactiv Plan only since 1992; in fact, the record is unclear as to

when the Grahams themselves realized this fact.

8. June 22, 2001 was not the only day after his receipt on June 11 of the $2,700 estimate that Graham called Hewitt. All told, Graham placed thirteen telephone calls to the auto-

Ultimately, Graham received a Pension Election Authorization Form from Hewitt dated June 25, 2001. *See* Pls. Ex. 5. He signed it on July 1, 2001, thereby confirming his election of a fifty percent joint and survivor annuity pension. According to the Pension Election Authorization Form, Graham was to receive $2,298.33 per month. *Id.* At this point, Graham had already resigned his employment with PCA effective June 29, 2001.

### III. Discovery of the Error and the Resultant Litigation

Eventually, Hewitt discovered the error respecting Graham's pension benefit calculation. Specifically, Hewitt discovered that it had calculated Graham's benefit erroneously by using thirty-five years as the number of years of plan participation. As of July 25, 2001, however, Hewitt, by means not disclosed in the record, had learned that, although Graham had worked continuously at the Richmond plant since 1960, he had only participated in the Pactiv/Tenneco Plan since 1992. In other words, Graham only had approximately nine years of participation in the Pactiv Plan, as opposed to the previously assumed thirty-five years. Upon realizing this mistake, Hewitt employees attempted unsuccessfully to contact Graham by telephone, eventually leaving a voice message on his home answering machine on July 25, 2001.

Later that afternoon, Graham and his wife returned Hewitt's call. A Hewitt representative advised the Grahams of the error respecting the years of participation and told them that Hewitt would soon send out additional written materials. On August 13, 2001, Hewitt mailed Graham a corrected packet of pension materials, including a revised Pension Calculation Statement. *See* Pls. Ex. 6. The revised statement set forth a single life annuity of $1,087.60 per month and indicated that Graham had begun his participation in the Pactiv Plan on January 1, 1992.[9] Instead of accepting this lower pension amount, however, Graham decided to seek relief through the internal claims procedure applicable to the Pactiv Plan. To this end, in the fall of 2001, Graham retained the services of counsel.

On November 5, 2001 Graham's lawyer first communicated with the Pactiv Benefits Committee by making an oral request for plan information—specifically a copy of the most current SPD and other related plan information.[10] Then, on December 7, 2001, Graham's counsel sent the Pactiv Benefits Committee a letter which described Graham's view of the facts, alleged various violations of ERISA, and requested a monthly pension payment based on the higher benefit estimates that Hewitt had communicated to Graham in June 2001. *See* Pls. Ex. 7. Graham's lawyers styled this letter as an appeal. On April 10, 2002, the Pactiv Benefits Committee responded to this letter and issued an "Initial Administrative Action" which denied Graham's request for a pension at the

mated system between June 11 and June 27, 2001. Moreover, each of these calls resulted in computer-generated single life annuity pension estimates of approximately $2,700 per month.

9. Hewitt did not inform the Pactiv Benefits Committee about the mistakes respecting Graham's pension estimates until sometime after August 1, 2001. The precise date of Hewitt's notification is unknown, but Marci Major, a Pactiv Corporation employee, has stated under oath that she believes that the notification occurred sometime during the last quarter of 2001. *See* Def. Ex. 1.

10. Counsel repeated this oral request on March 29, 2002. These oral requests form a partial basis for the allegations contained in Count Three of the Complaint. *See also infra,* note 11 and accompanying text.

amount requested by Graham's counsel and explained that the Pactiv Plan did not allow for a pension in that amount. Moreover, the Initial Administrative Action letter informed Graham that the Pactiv Benefits Committee was treating it as an initial claim for pension benefits even though it was termed an "appeal."

On April 12, 2002, Graham's counsel sent the Pactiv Benefits Committee a letter stating:

> Please send me a copy of you [sic] plan documents describing the procedures Mr. Graham must follow in pursuing his complaint regarding his benefits claim. Please also inform me of the name of the plan administrator and all other persons who are fiduciaries of the plan. Please call me immediately to discuss this matter.

Pls. Ex. 12.[11] In response, on April 25, 2002, the Pactiv Benefits Committee sent Graham's attorney a copy of the most recent Pactiv Plan SPD, explaining that this document would be responsive to the April 12 requests.

By letter dated June 4, 2002, Graham's counsel then filed an appeal of the Initial Administrative Action. This appeal reiterated Graham's version of the facts, alleged various ERISA violations and again requested a pension benefits package based upon the higher pension estimates described in Hewitt's June 2001 correspondence. The Pactiv Benefits Committee denied this appeal in a July 31, 2002 "Final Administrative Action." Notably, this letter informed Graham that the denial was based on Special Appendix XLIV. The appendix, however, was not provided to Graham at that time.

On November 13, 2002, Graham's counsel sent the Pactiv Benefits Committee a letter indicating that Graham would apply for the lower pension. This letter indicated, however, that, in accepting the pension payment, Graham was not waiving his rights under ERISA or his right to pursue the larger pension amount. In response, Hewitt sent Graham another packet of pension materials dated November 21, 2002. This packet included another Pension Calculation Statement describing a single life annuity payment of $1,094.38 per month, or a seventy-five percent joint and survivor annuity payment of $861.94 per month, beginning on January 1, 2003. This statement also indicated that Graham had nine years and four months of participation in the Pactiv Plan. Hewitt sent Graham a Pension Election Confirmation Statement and a Pension Election Authorization Form on December 19, 2002 which indicated that Graham had selected a seventy-five percent joint and survivor annuity that would provide him $861.94 per month starting on January 2, 2003. Graham began receiving this amount effective January 1, 2003.[12]

After exhausting his internal appeals, Graham, on February 19, 2003, filed a four count, eighty-three paragraph Complaint in this Court, naming the Pactiv Plan itself, as well as the Pactiv Benefits Committee, as defendants. Count One alleges that the terms of the Pactiv Plan rightly entitle Graham to pension benefits in the amount of approximately $2,700 per month and that the denial of this pension amount constitutes arbitrary, illegal and capricious action. Count Two asserts an equitable estoppel theory, claiming that, but for the

---

**11.** This letter forms a partial basis for the allegations contained in Count Three. *See also supra,* note 10.

**12.** It does not appear to be disputed that the Pactiv Benefits Committee understood that

Graham's election to accept the lesser sum was made without waiver of his right to pursue an appeal in the courts. It also is undisputed that Graham never sought to rescind his election to retire and never asked to return to employment with PCA.

misrepresentations made to Graham respecting the amount of his pension, he would not have elected early retirement. Count Three alleges that Graham is entitled to penalties under 29 U.S.C. § 1132(c)(1), which imposes penalties on an ERISA administrator who fails or refuses to respond to requests for information. Count Four of the Complaint alleges that the Defendants breached various fiduciary duties to Graham.

Shortly after filing the Complaint, Graham voluntarily dismissed Count One.[13] After discovery was ended, the Pactiv Benefits Committee filed a motion for summary judgment as to Counts Two, Three and Four.[14] Oral arguments were held on November 13, 2003. During oral argument on the motion for summary judgment, counsel for Graham admitted that, respecting Counts Two and Four, even if he were to prove his allegations of equitable estoppel and breach of fiduciary duty, he would not be entitled to the relief sought in his Complaint (*e.g.*, pension benefits at the higher amount, reinstatement to his job, back pay, reinstatement to the plan) because those remedies were either inappropriate under the statute or simply not available against the remaining defendant, the Pactiv Benefits Committee. Transcript of Hearing of Nov. 13, 2003, at 134 [hereinafter "H.T."]. He argued, however, that, if the non-relief elements of Counts Two and Four could be proved, Graham would be entitled to relief in the form of attorney's fees. H.T. at 135. Unsure whether a naked claim for attorney's fees could be considered as the relief component of a claim under an ERISA equitable estoppel claim or a breach of ERISA fiduciary duty claim, the Court allowed the parties to file additional papers on the topic. *Id.* at 136.

As explained below, the Court concludes that, although there is no decisional law directly on point, an award of attorney's fees, independent of an award of any other relief, cannot satisfy the relief component of an ERISA equitable estoppel claim or an ERISA-based breach of fiduciary duty claim. Thus, respecting Count Two and Count Four, because Graham has failed to show that he is entitled to relief under the statute, the motion for summary judgment respecting those counts is granted. As to Count Three, Graham has failed to show the existence of facts sufficient to support application of the penalties provided in 29 U.S.C. § 1132(c). Thus, the motion for summary judgment must also be granted as to that count. The action, therefore, will be dismissed with prejudice.

## DISCUSSION

The standards applicable to summary judgment motions are well-established. Summary judgment is proper only when there are no genuine issues as to any material facts and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994). Summary judgment, however, is not a disfavored procedural shortcut, but rather is an integral part of the Federal Rules of Civil Procedure, designed to secure the

---

**13.** It is undisputed that the remaining counts do not properly state a claim against the Pactiv Plan itself. The Pactiv Plan itself is not a fiduciary, is not liable for penalties under 29 U.S.C. § 1132(c)(1) and cannot be estopped. Thus, the only remaining defendant is the Pactiv Benefits Committee, which, again, acts as fiduciary and administrator of the Pactiv Plan.

**14.** The Pactiv Benefits Committee also filed a motion to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6). On November 10, 2003, that motion was denied without oral argument.

just and expeditious resolution of every civil matter. *Sibley v. Lutheran Hosp. of Md., Inc.,* 871 F.2d 479, 483 n. 9 (4th Cir.1989) (citing *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. 2548).

In reviewing a motion for summary judgment, a court must view the facts, and any inferences drawn from these facts, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Nguyen v. CNA Corp.,* 44 F.3d 234, 236 (4th Cir. 1995). A fact is material "when proof of its existence or nonexistence would affect the outcome of the case, and an issue is genuine if a reasonable jury might return a verdict in favor of the non-moving party on the basis of such issue." *Northwestern Mut. Life Ins. Co. v. Atlantic Research Corp.,* 847 F.Supp. 389, 394 (E.D.Va.1994). "The nonmoving party is entitled to have its version of all that is disputed accepted, all conflicts resolved in its favor, and to

have the benefit of all favorable legal theories invoked by the evidence." *Kohl's Dept. Stores, Inc. v. Target Stores, Inc.,* 290 F.Supp.2d 674, 678 (E.D.Va.2003). The party who bears the burden of proof on an issue at trial, however, cannot survive summary judgment without sufficient evidence to sustain his burden of proof on that point. *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. 2548. These precepts inform and guide the resolution of the motion.[15]

## I. Count Two: Equitable Estoppel

■ Equitable estoppel is a "well-established concept invoked by courts to aid a party who, in good faith, has relied, to his detriment, upon the representations of another." *United States for Use and Benefit of Humble Oil & Ref. Co. v. Fid. & Cas. Co. of N.Y.,* 402 F.2d 893, 897 (4th Cir.1968); *see also Dawkins v. Witt,* 318 F.3d 606, 611 n. 6 (4th Cir.2003); *Garland v. Pargas, Inc. of Waldorf, Md.,* 575 F.2d 1091, 1094 (4th Cir.1978). In this action, Graham alleges that the Pactiv Benefits Committee, through its agent Hewitt,[16]

**15.** The Pactiv Benefits Committee asserts further that, because it has the sole discretionary authority to determine eligibility for benefits and to construe the terms of the Pactiv Plan, this Court should review its decisions under the deferential "abuse of discretion" standard. *See Firestone & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also Haley v. Paul Revere Life Ins. Co.,* 77 F.3d 84, 89 (4th Cir.1996) ("[I]f the plan administrator's decision falls within the scope of the administrator's contractually conferred discretion, the court may review the merits of an administrator's decision only for an abuse of discretion."). Graham, however, is no longer asking the Court to find that he is entitled to thirty-five years of participation in the Pactiv Plan or that he is entitled to an annuity benefit of $2,700 per month. In other words, although resolution of the summary judgment motion necessarily will turn on the various documents describing and containing the Pactiv Plan, its resolution will not require the Court to determine Graham's benefits under the Pactiv Plan or to construe it in the fashion discussed in *Bruch* and its progeny. The abuse of discretion standard,

therefore, is inapplicable; rather, the typical summary judgment standards and precepts outlined above control.

**16.** Hewitt exercises no discretion over the Pactiv Plan and is not charged with the plan's management or implementation. Thus, Hewitt is not an administrator or fiduciary for purposes of ERISA. *See* 29 U.S.C. §§ 1002(16)(A), 1002(21)(A); 29 C.F.R. § 2509.75–8. Moreover, it is well-established in this circuit that an entity such as Hewitt that merely carries out ministerial duties or processes claims is not subject to ERISA law or penalties. *Custer v. Sweeney,* 89 F.3d 1156, 1162 (4th Cir.1996). Plan administrators, however, "may not evade their responsibility under ERISA by contracting to third parties the obligations they have under ERISA." *Weaver v. Phoenix Home Life Mut. Co.,* 990 F.2d 154, 158 (4th Cir.1993); *see also Colleton Reg'l Hosp. v. MRS Med. Review Systems,* 866 F.Supp. 896, 903 (D.S.C.1994). In other words, because Hewitt is the Pactiv Benefits Committee's contractual agent, the Pactiv Benefits Committee is responsible for any acts or omissions committed by Hewitt. Thus, if Graham can otherwise prove his case for eq-

made misstatements of material fact on which he relied to his detriment. Graham asserts that, but for Hewitt's many erroneous estimates and misstatements, he would not have retired when he did and thus would not be receiving the lesser pension amount that he accepted under protest.[17] As noted above, however, the Plaintiff, whatever the substantive merits of his equitable estoppel claim, has failed to show that Count Two, even if proved, would entitle him to a remedy. Thus, because a claim without a remedy cannot stand, Count Two must be dismissed. *See Farr v. U.S. W. Communications, Inc.,* 151 F.3d 908, 916–17 (9th Cir.1998) (Merhige, J.) (affirming grant of summary judgment for defendants because plaintiffs could not show entitlement to any relief under ERISA).

■ In Count Two of his Complaint, Graham prayed for relief under 29 U.S.C. § 1132(a)(3), an ERISA provision that allows an injured party to obtain "appropriate equitable relief." This provision, by its terms, does not allow for legal, *i.e.,* monetary, relief. *Great–West Life & Annuity*

*Ins. Co. v. Knudson,* 534 U.S. 204, 209–10, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002); *Rego v. Westvaco Corp.,* 319 F.3d 140, 145 (4th Cir.2003). Moreover, the United States Court of Appeals for the Fourth Circuit has held that the doctrine of equitable estoppel cannot operate to alter the written terms of an ERISA-regulated plan; and, consequently, Graham cannot use an equitable estoppel theory to alter the terms of the Pactiv Plan. *Bakery Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.,* 118 F.3d 1018, 1027 (4th Cir.1997); *Coleman v. Nationwide Life Ins. Co.,* 969 F.2d 54, 59 (4th Cir.1992). Thus, even if Graham fully proved the allegations contained in Count Two, the Court could not require the Pactiv Benefits Committee to base Graham's pension benefits on the erroneously quoted thirty-five years of participation in the Pactiv Plan or to pay him the erroneously quoted monthly annuity of approximately $2,700.

Although the Complaint originally sought those remedies, Graham recast the nature of the requested relief in his brief

uitable estoppel, the fact that Hewitt rather than the Pactiv Benefits Committee made the erroneous estimates and other misstatements would not foreclose Graham's claim. *Weaver,* 990 F.2d at 158.

**17.** As an initial matter, the ERISA statute itself contains no equitable estoppel provisions. Although it "is a comprehensive and reticulated statute [that is] the product of a decade of congressional study of the Nation's private employee benefit systems," in enacting ERISA, Congress intended the courts to fill in any gaps in the statute by developing a federal common law of rights and obligations under ERISA-regulated plans. *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 209, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) (internal quotations and citations omitted); *see also Jenkins v. Montgomery Indus., Inc.,* 77 F.3d 740, 743 (4th Cir.1996) ("Congress intended courts to fill in the statute's gaps by developing a 'federal common law of

rights and obligations under ERISA-regulated plans.' ") (quoting *Bruch,* 489 U.S. at 110, 109 S.Ct. 948). In other words, although it should be "reluctant" to do so, this Court may apply common law concepts (such as equitable estoppel) to fill in ERISA's gaps when the statute requires an "interstitial fix." *Rego v. Westvaco Corp.,* 319 F.3d 140, 148 (4th Cir. 2003). Moreover, the United States Court of Appeals for the Fourth Circuit has indicated it may be appropriate to apply the concept of common law equitable estoppel in certain kinds of ERISA cases. *See Bakery Confectionary Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.,* 118 F.3d 1018, 1028 (4th Cir.1997); *Elmore v. Cone Mills Corp.,* 23 F.3d 855, 863 (4th Cir.1994) (per curiam); *see also Sentara Va. Beach Gen. Hosp. v. LeBeau,* 182 F.Supp.2d 518, 521–22 (E.D.Va.2002). Because, however, the Plaintiff is not otherwise entitled to relief, the Court need not address the precise contours of an equitable estoppel claim in the ERISA context.

filed in response to the motion for summary judgment. In that paper, rather than seeking a higher annuity payment as a remedy, Graham contended that success on Count Two would entitle him to various equitable remedies, such as reinstatement in the Pactiv Plan, credit for the years of participation he would have earned but for his retirement, reinstatement to his job with PCA and back pay for the years of missed work. As recounted above, however, during oral argument, counsel for Graham admitted that the Pactiv Benefits Committee is not in a position to offer most of this proposed remediation and that the remainder of the amended prayer for relief is simply inappropriate. H.T. at 134.

Moreover, these concession aside, all of Graham's requested relief is inappropriate. For instance, as respects the putative reinstatement to employment and the award of back pay, the Pactiv Benefits Committee could not be required to reinstate Graham or remit back pay because the Pactiv Benefits Committee neither employed Graham nor supplied him with a paycheck. Of course, the decisional law holds that reinstatement and back pay may be an appropriate remedy under 29 U.S.C. § 1132(a)(3). *Varity Corp. v. Howe*, 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 385 (4th Cir. 2001). Before, however, such equitable remedies may be imposed, they must be otherwise "appropriate." 29 U.S.C. § 1132(a)(3); *see also Griggs*, 237 F.3d at 385. For reinstatement to be appropriate, the defendant must be in a position to rehire the plaintiff. For back pay to be appropriate, the defendant must be susceptible to liability for back pay. The Pactiv Benefits Committee simply is not amenable to these two requested forms of relief. Under familiar principles then, it would be inappropriate to require the Pactiv Benefits Committee to reinstate Graham or to remit back pay.

■ Likewise, Graham's proposal that the Pactiv Benefits Committee accord him "credit" for years of participation in the Pactiv Plan that he would have earned but for his early retirement runs afoul of another basic premise of ERISA law. Specifically, equitable estoppel cannot be invoked to alter the written terms of an ERISA-regulated plan. *Ralph's Grocery Co.*, 118 F.3d at 1027–28. And, the Pactiv Plan defines the term years of participation to mean periods of *active* employment. For that reason, the Pactiv Benefits Committee could not grant this form of relief. Indeed, the Court could not require it to do so because an ERISA-regulated administrator is required to enforce strictly the terms of the plan for the benefit of the participants and beneficiaries as a whole. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985); *Coleman*, 969 F.2d at 58–59. The law, therefore, would not allow the Court to impose a remedy whereby the Pactiv Benefits Committee would be required to give Graham credit for years of unearned participation in the Pactiv Plan. Thus, based on the concessions made by Graham's counsel during oral argument and the relevant decisional law, Graham is not entitled to equitable relief under 29 U.S.C. § 1132(a)(3).

When this fact became apparent during oral argument, Graham, however, refused to dismiss Count Two voluntarily. Rather, Graham contended that successfully proving Count Two would at least entitle him to the remedy of attorney's fees under ERISA. *See* 29 U.S.C. § 1132(g)(1) (permitting court to award attorney's fees in its discretion); *see also Denzler v. Questech, Inc.*, 80 F.3d 97, 103 (4th Cir.1996) ("ERISA allows courts to award ... reasonable attorney's fees."). This argument is simply without merit.

In the Fourth Circuit, "only a prevailing party is entitled to consideration for attorney's fees in an ERISA action." *Martin v. Blue Cross & Blue Shield, Inc.,* 115 F.3d 1201, 1210 (4th Cir.1997); *see also Gallagher v. Reliance Standard Life Ins. Co.,* 305 F.3d 264, 276 n. 13 (4th Cir.2002). And, unless one is otherwise entitled to relief, one cannot be a "prevailing party." *Martin,* 115 F.3d at 1210. A plaintiff "prevails" for purposes of the awarding of attorney's fees only when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff. *Farrar v. Hobby,* 506 U.S. 103, 110–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). In other words, unless the plaintiff actually obtains some *relief* on the merits of his claim, he is not a prevailing party. *Saleh v. Moore,* 95 F.Supp.2d 555, 565 (E.D.Va.2000). This is true even if the plaintiff otherwise proves every allegation in his complaint; simply put, if proof of the allegation does not otherwise allow the court to "materially alter[ ] the legal relationship between the parties by modifying the [d]efendant's behavior in a way that directly benefits the [plaintiff]," the plaintiff cannot be considered a "prevailing party." *Saleh,* 95 F.Supp.2d at 565.

At bottom, Graham is asking the Court to countenance a tautology: because Graham is a prevailing party he is entitled to attorney's fees, and, because he is entitled to attorney's fees, he is a prevailing party. Although it is true that an award of attorney's fees would "materially alter[ ] the legal relationship between the parties by modifying the [d]efendant's behavior in a way that directly benefits the [plaintiff]," *Saleh,* 95 F.Supp.2d at 565, Graham cannot bootstrap an award of attorney's fees to prove the necessary elements of the requisite precursor finding of prevailing party status.[18] Thus, because a claim for which there is no available remedy fails as a matter of law, summary judgment is granted as to Count Two. *Farr,* 151 F.3d at 916–17.

## II. Count Three: Failure to Provide Graham with Requested Information

In Count Three of the Complaint, Graham alleges that the Pactiv Benefits Committee, acting as the administrator of the Pactiv Plan, failed to provide him with requested plan information. The count further alleges that Graham is entitled to damages under ERISA 29 U.S.C. § 1132(c)(1) which provides that, if an administrator fails to provide requested information within thirty days of its request, it may be liable to the participant in the amount of up to $100 per day. Graham points to oral requests of November 5, 2001 and March 29, 2002, as well as a written request of April 12, 2002, to support his contention that the administrator failed to supply him with requested information.[19] The record respecting Count

18. Moreover, because the provision of ERISA here at issue does not allow for legal relief, Graham could not secure an award of nominal damages and thereby become a prevailing party. *Compare with Farrar,* 506 U.S. at 112, 113 S.Ct. 566 (holding that plaintiff who obtains award of nominal damages qualifies as "prevailing party" under 42 U.S.C. § 1988).

19. In addition, during oral argument, Graham pointed to two letters, one sent by counsel to the Pactiv Benefits Committee on De-

cember 7, 2001 (Pls.Ex. 7) and one sent by counsel on June 4, 2002 (Pls.Ex. 13), to support Count Three. However, these letters, which Graham did not allege in the Complaint, do not, even liberally construed, "request" any documents or information. By the provision's very terms, only a "request" can trigger liability under 29 U.S.C. § 1132(c)(1). The fact that counsel sent these letters, therefore, does not implicate 29 U.S.C. § 1132(c)(1).

Three contains no material issues of disputed fact. Moreover, for the reasons explained below, the Pactiv Benefits Committee prevails against this count as a matter of law.

On November 5, 2001, Graham's counsel called the Pactiv Benefits Committee and made an oral request for a current SPD and any other relevant documents and information. Counsel repeated this oral request on March 29, 2002. Graham notes that the Pactiv Benefits Committee did not provide him or his lawyer with a copy of the most recent SPD until May 2002. Moreover, Graham contends that the November 5, 2001 and March 29, 2002 communications were broad enough to request Special Appendix XLIV. It is undisputed that the Pactiv Benefits Committee did not provide Graham or his lawyer with a copy of that document until it appended it to the answer filed in response to the Complaint in this action. Graham, therefore, states that he is entitled to the penalties provided by 29 U.S.C. § 1132(c)(1).

In response, the Pactiv Benefits Committee does not dispute the fact that Graham's lawyer made the oral requests for plan information. Rather, it correctly asserts that, as a matter of law, counsel's oral requests are insufficient to trigger 29 U.S.C. § 1132(c)(1) penalties.

■■ As a basic proposition, oral requests may, in certain circumstances, trigger the penalties contained at 29 U.S.C. § 1132(c)(1).[20] Section 1132(c)(1) provides that penalties may be imposed on a plan administrator who "fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish." Thus, Section 1132(c)(1) uses the broader term "request," not the more specific term "written

request." The statutory penalties provided in Section 1132(c)(1), however, are only triggered when a participant requests information that ERISA otherwise requires the administrator to disclose. In other words, Section 1132(c)(1) is merely a penalty provision; it does not itself define what an administrator must disclose or how a participant must make a disclosure request. As recognized, therefore, in *Brooks v. Metrica, Inc.,* 1 F.Supp.2d 559 (E.D.Va.1998), whether a request needs to be in writing in order to trigger penalties under Section 1132(c)(1) depends on the language that is contained in the particular ERISA subchapter which imposes the disclosure requirement in the first instance.

In *Brooks,* the plaintiff participant orally requested that the plan administrator provide him with the reasons for denial of claimed benefits. In determining that this oral request was sufficient to trigger Section 1132(c)(1) liability, the court first determined that ERISA subchapter Section 1133(1) requires an administrator to " 'provide adequate notice in writing to any participant ... whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial.' " *Brooks,* 1 F.Supp.2d at 565 n. 9 (quoting 29 U.S.C. § 1133(1)). Importantly, Section 1133(1) does not require that any request for such notice be in writing. The *Brooks* court, therefore, held that, because the specific ERISA provision imposing the disclosure requirement does not require that a request be in writing, the plaintiff participant's oral request for such information was sufficient to trigger penalties under Section 1132(c)(1). *Brooks,* 1 F.Supp.2d at 566 ("[A] plan's failure to comply with a participant's oral request for information ERISA requires the plan to provide is

---

**20.** As an initial matter, a request from a participant's lawyer, as opposed to one from the participant himself, is sufficient to trigger the

statutory penalties of 29 U.S.C. § 1132(c)(1). *Brooks v. Metrica, Inc.,* 1 F.Supp.2d 559, 567 (E.D.Va.1998).

sufficient to trigger statutory damages, provided that the Act does not explicitly state that the request for the relevant documents or information must be made in writing."). In other words, because the particular ERISA subchapter governing the relevant information did not impose a written request requirement, the *Brooks* court was unwilling to import such a requirement to 29 U.S.C. § 1132(c)(1).

Graham asserts that his November 5, 2001 and March 29, 2002 oral requests for the most recent SPD and other relevant documents triggered 29 U.S.C. § 1132(c)(1). According to the framework outlined in *Brooks*, this Court must first identify the specific ERISA subchapter, if any, that would require an administrator to disclose such information and then determine whether this subchapter requires a request to be in written form. ERISA 29 U.S.C. § 1024(b)(4) is the relevant subchapter. It states that an "administrator shall, *upon written request* of any participant or beneficiary, furnish a copy of the latest updated summary plan description ... [as well as any] other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4) (emphasis added). This subchapter clearly imposes a duty to provide Graham with a copy of the most current SPD. Moreover, because it is arguably an "instrument[ ] under which the plan is ... operated," the Pactiv Benefits Committee may also have had a duty under Section 1024(b)(4) to provide Graham with a copy of Special Appendix XLIV. *See generally Faircloth v. Lundy Packing Co.,* 91 F.3d 648, 653 (4th Cir. 1996) (interpreting "other instruments under which the plan is established or operated" language of 29 U.S.C. § 1024(b)(4)).

■ The disclosure provisions contained in Section 1024(b)(4), however, are only triggered upon a "written request." In other words, although ERISA would impose a disclosure requirement on the Pactiv Benefits Committee respecting the requested documents, the specific ERISA subsection imposing this requirement is not triggered by mere oral requests. Thus, as a matter of law, Graham's November 5, 2001 and March 29, 2002 oral requests cannot form the basis for penalties under Section 1132(c)(1). To the extent, therefore, that it depends on the November 5, 2001 and March 29, 2002 oral requests, Count Three is simply untenable.

■ Also in Count Three, Graham points to a April 12, 2002 letter sent by his attorney to the Pactiv Benefits Committee. *See* Pls. Ex. 11.[21] In this letter, Graham's counsel requested any plan documents describing the procedures Graham must follow in pursuing his complaint regarding his benefits claim. Counsel also requested the name of the plan administrator. In response to this request, on April 25, 2002, the Pactiv Benefits Committee sent the Plaintiff's counsel a letter summarizing briefly the procedures Graham needed to follow in perfecting his appeal. *See* Pls. Ex. 12. Moreover, the Pactiv Benefits Committee included with this letter a copy of the most recent Pactiv Plan SPD. Thus, the evidence shows that the Pactiv Benefits Committee responded promptly and completely to counsel's April 12, 2002 request for the most recent SPD. The evidence also establishes that the Pactiv Benefits Committee's response was responsive to counsel's request. The communication and the most recent SPD contained the name of the plan administrator and the information Graham needed in order to pursue his complaints. The Pactiv Benefits Committee, therefore, discharged its

---

**21.** The text of this letter is set out in full in the statement of facts. *See supra,* note 11 and accompanying text.

ERISA disclosure obligations by sending the April 25, 2002 letter and including the most recent SPD.

Graham, however, asserts that the April 12, 2002 request was broad enough to encompass Special Appendix XLIV. In essence, although Graham admits that the Pactiv Benefits Committee sent him a copy of the most current SPD, he argues that Special Appendix XLIV was a document responsive to his request and that the failure to provide him with this document triggers the penalty provision of Section 1132(c)(1). The April 12, 2002 letter, however, only requested information relevant to the *processes* that Graham needed to follow in order to perfect his appeal. Although Special Appendix XLIV indeed contains substantive information respecting Graham's pension, nothing in that document is pertinent to perfecting or otherwise pursuing an appeal. For that reason, Graham's contention that the April 12, 2002 request for information pertinent to his appeal was broad enough to implicate disclosure of Special Appendix XLIV lacks merit. Because the record establishes that the Pactiv Benefits Committee responded promptly and adequately to the request, Graham is not entitled to penalties under Section 1132(c)(1) respecting the April 12, 2002 written request for information. Thus, Count Three will be dismissed with prejudice.

### III. Count Four: Breach of Fiduciary Duties

In the fourth and final count of the Complaint, Graham alleges that the Pactiv Benefits Committee breached the fiduciary duties imposed on it under ERISA 29 U.S.C. § 1104(a) by providing him with misinformation respecting the pension plan, by failing to disabuse him of misapprehensions of which it knew, or of which it should have known, that Graham had respecting the Pactiv Plan and by creating and distributing an insufficient SPD.

Again, however, because Graham has not shown that he is entitled to any relief, Count Four is dismissed.

In enacting ERISA, Congress provided a private right of action under which plan participants and beneficiaries may sue in order to enforce fiduciary obligations. *See* 29 U.S.C. § 1132(a)(1); *see also Howe,* 516 U.S. at 507, 116 S.Ct. 1065; *Mertens v. Hewitt Assoc.,* 508 U.S. 248, 253, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *Griggs,* 237 F.3d at 373. In order to establish a breach of fiduciary duty claim and, therefore, survive summary judgment, Graham must show that the Pactiv Benefits Committee was a fiduciary under ERISA, that it breached its fiduciary duties and that Graham is entitled to relief.

█ It is beyond dispute that the Pactiv Benefits Committee is a fiduciary for ERISA purposes. *See generally* 29 U.S.C. § 1002(21)(A). Even assuming, however, that Graham has presented evidence sufficient to show that the Pactiv Benefits Committee breached its fiduciary duties, he has not shown that such a finding would entitle him to relief under ERISA. In other words, the same defects that compel the dismissal of Count Two also sound the death knell as to Count Four.

In the Complaint, Count Four alleges that Graham is entitled to "appropriate equitable relief" under 29 U.S.C. § 1132(a)(3). However, as was true with respect to Count Two, during oral argument, Graham conceded that, even assuming that he could otherwise prove a breach of fiduciary duty, the undisputed factual record illustrates that he is not entitled to relief under 29 U.S.C. § 1132(a)(3). Moreover, for the same reasons as discussed above with respect to Count Two, Graham's attempt to salvage the claim by asserting entitlement to a naked award of attorney's fees as the claim's damage element must fail. *Cf. Ruckelshaus v. Sierra*

*Club,* 463 U.S. 680, 694, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983). Thus, on this record, as a matter of law, the motion for summary judgment must be granted as to Count Four. *Farr,* 151 F.3d at 916–17.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment of Defendants (Docket No. 27) is GRANTED. The action, therefore, is hereby dismissed with prejudice in its entirety.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.